Elmore *v.* The Naugatuck Railroad Company.

## ELMORE *vs.* THE NAUGATUCK RAILROAD COMPANY.

In an action against a railroad corporation, to recover for the loss of goods, directed to a place situated beyond the line of their road, neither the receiving of such goods for transportation, nor a receipt, given by the corporation, stating that the goods were so received, nor an advertisement, by such corporation, of the general facilities for transportation, is evidence of a special contract to carry such goods to the place to which they were directed; but only to deliver them at the end of said road, thence to be forwarded in the usual course of business.

The late English cases, which appear to conflict with the above principle, have not been adopted as the law of this state.

THIS was an action, against the defendants, as common carriers, brought to recover the value of seven bales of leather.

The defendants pleaded the general issue, upon which the cause was tried at Litchfield, August term, 1855.

On the trial, the plaintiff gave in evidence,

1. The charter of the defendants, which authorized the construction of their road from Winsted to Bridgeport, in this state.

2. An advertisement printed in two newspapers, published in the town of Litchfield, and in one newspaper, published in the town of Waterbury, from the time of their date, till after the injury complained of, and which was in these words :

"NAUGATUCK RAILROAD.

" To Freight Shippers. Freight will be way-billed from each station for New York, New Haven, and Bridgeport.

" 🖙 The facilities for transporting freight, having been greatly increased, shippers may rest assured that their goods will be taken through to their destination with despatch.

"PHILO HURD, *Superintendent.*
"BRIDGEPORT, April 29th, 1852."

3. The testimony of Floriman Tyler, which was as follows: " On the 21st of July, 1852, I was the plaintiff's agent to carry, and did carry some leather of the plaintiff to the depot

of the defendants at Wolcottville, *viz.*, five bales marked Cook & Mann, New York, and two bales marked Rich & Loutrel, New York, and delivered the same to H. B. Richards, the agent of the defendants, and took of him two receipts therefor, one of which was in the following words :

' No. 372.          WOLCOTTVILLE, July 21st, 1852.

' Received for transportation in good order from J. D. Elmore, 5 bales leather, 1,297 lbs., consigned to Cook & Mann, N. Y.   For the Naugatuck Railroad Company,

'H. B. RICHARDS.'

" The other receipt was of the same tenor and date, for ' two bales of leather,' consigned to ' Rich & Loutrel, New York.' "

4. The testimony of Elisha S. Elmore, who testified to the value of the leather, and that he was the agent of the plaintiff in his business ; that the plaintiff's factory was about four miles and a half from Wolcottville ; that he supposed the defendants' road terminated at Bridgeport, and that he never thought how the goods went to New York.

5. The testimony of John D. Elmore, the plaintiff, who testified that he knew not, and never thought, how the goods were going to get to New York, and supposed the defendants would take them to New York.   There was nothing said between him and the railroad.   He supposed the railroad liable to transport the goods.   The defendants had been in the habit of taking his goods in the same way. He gave no directions as to the manner in which the goods sued for, were to be forwarded from Bridgeport.   His goods from New York sometimes came to him by the New York and New Haven railroad, and sometimes by steamboat. He never noticed any notices posted in the office of the defendants at Wolcottville, stating how the goods would be forwarded, nor cared anything about it.   He did not know that he had ever received a printed notice from the defend-

ants. For a year before the injury complained of, he had sent his goods by the railroad of the defendants. He knew their road terminated at Bridgeport.

The defendants gave in evidence, 1. A notice or hand-bill, of which the following is a copy:

"NOTICE TO SHIPPERS.

"To avoid errors in the transhipment of freight to New York, all freight destined to that place will be sent hereafter by ☞ Steamers, ☜ unless marked ' by Railroad to New York.'

"PHILO HURD, *Sup't.*

"BRIDGEPORT, April 1st, 1852."

2. A way-bill, of which the following is a copy:

"NAUGATUCK RAILROAD. No. 64.

"Way-bill of Merchandise from Wolcottville to Bridgeport, July 21st, 1852.

| No. Car. | Consignee. | Destination. | Description of Articles. |
|---|---|---|---|
| | Marks & Duval. | N. York. | 5 Casks, B. Kettles. |
| 66 N | A | Boston. | "        Brass. |
| | Rich & Loutrel. | N. York. | 2 Bales Leather. |
| | Cook & Mann. | "      " | 5  "  "    "    " |
| | Edgar Palmer & Co. | Newark. | 1 Cask Locks. |

| Weight. | Rate. | Freight unpaid. |
|---|---|---|
| 2335 | 14 | 327 |
| 556 | " | 78 |
| 405 | 15 | 61 |
| 1297 | " | 195 |
| 396 | " | 59 |

3. The testimony of H. B. Richards, who testified that he was the agent of the defendants, at their station at Wolcottville, to receive and send freight by their cars; that on the 15th of June, 1851, they commenced sending all goods destined for places beyond Bridgeport, by steamboat from Bridgeport, unless otherwise directed; that about one year before the loss of the plaintiff's goods, Elisha S. Elmore, the brother and agent of the plaintiff, ordered the witness to send

all their goods to Bridgeport, and thence by steamboat to New York; that he enquired of the witness which way would be the cheapest, and that the witness informed him that the cheapest way was by steamboat, and that said Elmore directed him to send the goods by steamboat; that a few days after the above directions, he (the witness) saw John D. Elmore, (the plaintiff,) and told him that the defendants were sending his goods by order of his brother, (the said Elisha,) by the boat, and that the plaintiff replied, " It is all right ;" that on the 12th of April, 1852, the defendants published the "notice to shippers," or hand-bill above copied, and posted a copy of it in the defendants' office at Wolcottville, and also sent a copy to each of their principal shippers, and he believed he sent one to the plaintiff; that from and after the 16th of June, 1851, the defendants sent all goods for New York and beyond, not marked "by railroad," by steamboat from Bridgeport, and from said 16th of June, 1851, until the loss complained of, the witness sent all the plaintiff's goods, (including the goods said to be lost,) by order of Elisha S. Elmore, by the steamboat, except in two or three other instances, when special directions were given to send them by the New York and New Haven railroad, and he went with them, and that since the loss, he had orders to send the plaintiff's goods by said last mentioned road ; that all goods, marked by railroad to New York, were way-billed through to New York, and that all goods not so marked, were way-billed to Bridgeport; that on the 21st of July, 1852, he made and sent to Bridgeport, with the plaintiff's goods so said to be lost, a way-bill, a copy of which is above written ; that goods were from time to time received for transportation by the defendants, destined to New Orleans, California and other places beyond Bridgeport, and the custom and practice of the defendants was to give receipts therefor, in the same form as the receipts above mentioned, and unless they were directed to be forwarded by railroad to New York, to make out the way-bills to Bridgeport in the above form,

and to forward the goods from thence to New York by steam-boat; that the company never undertook to carry freight by boat; that there was no contract between the defendants and the owners of said boat; that the freight carried by the defendants was paid by the boat at Bridgeport, and that the shipper saved about one cent on the one hundred pounds, by forwarding goods by steamboat; that the plaintiff, for a year before the loss, received most of his goods from New York by steamboat; that he never but once was directed to send the plaintiff's goods by boat; that before, at, and from the 16th of June, 1851, until October, 1853, the witness, as agent of the defendants at Wolcottville, kept two certain tally books, containing the names of all consignees of goods from time to time forwarded, a description of the bales and boxes, place where directed, weight, freight, &c., and that when directions were given by shippers at Wolcottville, as to the manner in which their goods should be forwarded from Bridgeport, he, for his guidance, entered upon the fly-leaf and cover of said tally books, from time to time, but without dates, the names of the several shippers of freight, and against their names, the way in which their goods were directed to be sent, from Bridgeport, (whether by steamboat or railroad,) distinguishing the way, by writing against each name the word "Boat" or "S. Boat," meaning steamboat, or "R. R.," meaning railroad. The witness produced, as part of his testimony, said tally books, covering the period from June, 1851, to October, 1853. On the fly leaf of one of said tally books, which commenced September 9th, 1850, and terminated June 28th, 1852, were ten entries of goods to be sent by boat, and two of goods to. be sent by railroad. On the inside of said tally book there were seven entries of goods to be forwarded by railroad and twelve by steamboat.

4. The defendants also called as a witness, Alfred L. Deming, who testified, that since the loss, Elisha S. Elmore told him that he had not given instructions to send his goods by steamboat, but had directed the defendants to send the

goods by the cheapest way, and had never directed to send them by boat; that this was in a conversation about this cause.

5. The testimony of Clark B. Downs, who testified, that soon after the loss of the goods, said Richards and said Elisha Elmore were debating the liability of the defendants at their office in Wolcottville, and the witness said to said Elmore, (pointing to said hand-bill posted in said office,) "There is a notice that has been there over a year." To which said Elmore replied, "I know all about that, but Hollister says it makes no difference."

6. Alexander Lane, who testified, that he was the agent of the defendants at Bridgeport, to receive and forward freight intended to be forwarded by boat; that freight intended to go by steamboat was by the custom and practice of the defendants, way-billed to Bridgeport, and that intended to go from Bridgeport by railroad to New York, was way-billed to New York; that the custom was to send all goods destined for New York and beyond, by steamboat, unless otherwise specially directed; that the freight named in said way-bill came to Bridgeport on the day of its date, and was duly delivered on board the steamboat Alice. All freight to be sent by boat was delivered to the boat that went out first. The goods named in the way-bill were sent in the usual way by the first boat; that the boat was a competent boat, &c., a regular carrier. These goods were delivered to the steamboat Alice, which was to sail the next morning, and was the next boat to leave Bridgeport for New York, and was the first boat to leave after these goods came, according to the custom of the defendants; that said boat was, and long before had been, a regular boat from Bridgeport to New York; that the officers of the boat always paid to the defendants the freight carried by them before the boat sailed, and no credit was given for such freights. And that the defendants had no control over, and no interest in said

boat, and no interest in its earnings; that the railroad had no interest in sending by the steamers.

7. William D. Bishop, Esq., who testified, that he was a director of the Naugatuck Railroad Company at the time of the loss of the plaintiff's goods; that said company had no connection with, nor interest in said boat, nor in the freight carried by her, and no control over her, and that she was a good boat and a regular carrier of freight and passengers between Bridgeport and New York; that said company did not trust said boat for the freight of the company; that said company never undertook to carry goods by steamboat; that before the issuing of said hand-bill or notice, shippers had complained that goods were wrongly forwarded from Bridgeport by railroad or steamboat, and some shippers had made a private arrangement with the steamboat to carry their freight, and the object of the notice was, that shippers might understand definitely, which way their goods would go; that the road of the defendants terminated at Bridgeport, and there intersected the New York and New Haven railroad.

Elisha S. Elmore, being recalled by the plaintiff, testified, that his attention was called to said notice after the loss, whether before or not he could not say,—it might have been, and it might not; that he did not recollect the discussion with Richards about the liability of the defendants; that he knew there was a steamboat line to New York. That he did not recollect telling Dennis that the goods were to be sent by the cheapest route.

John D. Elmore, being recalled by the plaintiff, testified, that he never saw the "notice to shippers," to notice it, till after the loss.

The defendants, thereupon, requested the court to instruct the jury, that the defendants had no power by law, under their charter, or otherwise, to become common carriers of merchandise from Wolcottville to New York, nor beyond Bridgeport, one of the places mentioned in their charter, as

a terminus of their railroad, (and that they had a right to set up such want of power as a defence in the present action;) nor to make a contract, or to assume expressly, or implicitly, to carry the plaintiff's goods beyond the terminus of their road. That if any undertaking by them, or by any person professing to act as their agent, to carry the plaintiff's merchandise to New York, as common carriers of goods, was proved by the plaintiff, such undertaking was invalid, and imposed no legal obligation upon the defendants as common carriers, or otherwise, for the safe carriage of the goods, further than to Bridgeport. That the freight agent, Richards, had no authority to contract on behalf of the defendants to carry the plaintiff's goods further than to Bridgeport; or to charge the defendants with any obligations or duty as common carriers, or otherwise, to safely carry such goods, beyond that place. That if the defendants could lawfully, by any such contract, or arrangement, become common carriers beyond Bridgeport, or charge themselves with liability as such, there was no evidence in this case to warrant a finding that the defendants had made any such contract or arrangement with the New York and New Haven Railroad Company, creating, or imposing upon them any such liability. That said receipts for the goods in question, given in evidence by the plaintiff, imposed no duty, or obligation, upon the defendants, (even admitting the authority of Richards to give the same in the form in which they appear,) except to carry the goods safely to Bridgeport, the terminus of the defendants' route, and there deliver the goods to another suitable and responsible carrier, to be taken thence to New York. Nor did such advertisement, in said newspapers, impose any other obligation, nor did said receipts and advertisements, taken together, impose any other obligation on the defendants, nor did either or all of them. That posting, in the offices of the defendants where their business was conducted, and goods received and delivered, including the Wolcottville station, to which the plaintiff usually sent his goods for transportation, the notice or

hand-bill given in evidence by the defendants, was sufficient to exclude any duty of the defendants to convey and carry goods beyond Bridgeport, and to exclude any liability for loss of goods after the defendants had carried them to that place, and duly delivered them to another carrier by steamboat, even if the defendants be deemed to have had power to become common carriers to New York. That the defendants having delivered the goods to a carrier by steamboat, for transportation from Bridgeport to New York, were not responsible in the present action for the loss of the goods after such delivery. That the plaintiff could not recover for any omission to deliver the goods to the New York and New Haven Railroad Company, instead of a carrier by steamboat, because no such breach of contract or neglect of duty was complained of. And that there was no sufficient evidence to entitle the plaintiff to a verdict.

The court charged the jury, that the liability of the defendants rested upon what they should find to have been the real contract between the parties in respect to the transportation of the plaintiff's goods. That independently of any special contract, the defendants were not bound to carry the goods beyond the limits of their own road, whether they were marked or consigned to a place beyond said limits or not. That the question for them to determine was, therefore, whether in fact, and in law, the defendants contracted to carry the goods to New York, or whether they only contracted to carry them to Bridgeport, and from thence to forward them by steamers, or some other regular conveyance. That, in case they contracted to carry them to New York, they were liable, otherwise not, as it appeared the goods were destroyed after the safe arrival of them at Bridgeport. That by the defendants' charter, they had power to make a contract to transport the goods to New York, by an arrangement with the New York and New Haven railroad for that purpose, which arrangement the defendants had power to make, but that under a recent decision of the supreme court of

errors, the defendants had no power to contract to carry the goods beyond the termination of their railroad in any other way. The court, however, informed the jury that as the defendants had power, under their charter, to carry goods to New York, by means of the New York and New Haven railroad, if they made a contract to carry them there, without specifying the mode of conveyance, they were responsible for the safe transportation of the goods, whether they carried them in the manner they had power to carry them, or whether, for their own convenience, they departed from the mode in which they were authorized to carry them. The court also charged the jury, that the delivering of the goods to the defendants for transportation, consigned to New York, and taking the receipts from the defendants, without anything farther between the parties, was, *prima facie*, a contract to carry the goods to the place of destination according to the marks and directions upon them. The court also further instructed the jury, that as the defendants had no power to contract to carry the goods by steamer to New York, they were not liable for a loss beyond the termination of their railroad at Bridgeport, if there was a special contract with the plaintiff to carry them in that special mode, nor were they liable for such loss, if the plaintiff directed his goods to be transported from Bridgeport by steamer; nor were they liable if the plaintiff had knowledge of the usage of the defendants in causing all goods transported by them and consigned to New York, to be transported from Bridgeport by steamer, unless otherwise specially directed, and that as the language of the receipts given for the goods was equivocal, and as consistent with the intention to send by steamer from Bridgeport as by railroad, it was for the jury to find from all the evidence, whether there was a contract merely to transport the goods to New York. That if this was found, then the defendants were liable, but if there was a special contract to transport them to New York by railroad to Bridgeport, and from thence by steamer,

or if it was the general usage of the defendants so to cause all freight to be transported, unless otherwise directed, and the plaintiff knew it, and gave no direction, or if he specially directed the goods to be transported by steamer from Bridgeport, then the defendants were not liable, as it appeared that the goods were safely transported to Bridgeport, and there deposited for transportation on board the steamer. The jury thereupon rendered a verdict in favor of the plaintiff.

The defendants, conceiving that the court erred in the aforesaid instructions to the jury, and also in omitting to charge the jury as requested by them, and believing that the verdict in the cause was against the evidence, moved for a new trial.

*Seymour & Woodruff* and *J. H. Hubbard* in support of the motion.

1. The verdict is against evidence. In order to a recovery, the plaintiff must show, either that the defendants were in fact common carriers to New York, or represented themselves to be such, in such manner as to be estopped from denying it,—or must have made a valid, and special contract to carry safely to New York. There is no sufficient evidence to show, that the defendants are in fact common carriers to New York. Their railroad, under their charter, terminates in Bridgeport. Their powers, as common carriers, are limited to their own railroad. They neither owned the cars, nor received payment for transportation beyond Bridgeport.

The defendants have not represented themselves to be common carriers to the city of New York. The advertisement relied upon, is to be construed in connection with the charter; also in connection with the notice to shippers; also to be construed in connection with the testimony of the plaintiff and his agent, Elisha S. Elmore, which testimony shows that it had no effect as a representation upon the mind of the plaintiff. There is no evidence of a contract by the defendants to carry the goods safely to New York as

common carriers or otherwise. There was no special contract concerning these goods. The receipt merely acknowledges that they were received for transportation, and states how they were marked. There was a virtual direction by the plaintiff, that his goods should be sent to Bridgeport, and thence be forwarded by the boat to New York. The plaintiff, himself, admits that he knew Bridgeport to be the terminus of the defendants' road. The case shows, that the goods have been sent, and proceeded with in precise conformity with the plaintiff's directions.

2. The defendants, under their charter, can not be subjected, as common carriers, to the city of New York, because they have never given their agents, either in fact, or in law, authority to become common carriers beyond Bridgeport, nor empowered their agents to represent themselves to be such,— nor authorized their agents to make contracts binding them to that extent. *Hood* v. *New York and New Haven Railroad Company,* 22 Conn. R., 1 and 502.

3. The court below erred, first in instructing the jury, that the receipt and acceptance of the goods was, *prima facie,* evidence of a contract, by the defendants, to carry the goods through to their ultimate destination. The receipt imports an agreement merely to transport the goods to the terminus of the defendants' road, and then deliver them, in the usual course of the business, in the manner in which they in fact did deliver them. Secondly, in instructing the jury, that the defendants had power, under their charter, to make a contract for the transportation of goods to New York. *Hood* v. *New York and New Haven Railroad Company,* 22 Conn. R., 1.

*Buel* and *Hollister & Beman* contra.

1. The verdict is not against the evidence, but is manifestly supported and sustained by it. 1st. Under the instructions of the court, the jury have found as a matter of fact that the defendants received the goods for transportation upon an undertaking to transport them to New York, by the New

York and New Haven railroad and their own road, and failed to do it. 2d. The plaintiff had no knowledge of the defendants' usage or custom to send all goods, (not otherwise directed,) to New York by steamboat from Bridgeport; or of their notice to shippers to that effect,—and the plaintiff did not direct his said goods to be sent by boat but by railroad. 3d. The finding of the jury, the advertisements in the newspapers, the charter and the receipts, in connection with the other evidence, triumphantly sustain. 4th. To set aside the verdict, the court must find that it is entirely unsupported by the evidence; for though the court might have come to a different result from the jury, yet as the jury are the judges of the facts, if there was any evidence to warrant the jury in finding their verdict, it will not be disturbed by the court. 13 Conn. R., 328. 20 Conn. R., 570. 1 Sw. Dig., 811.

2. The charge of the court upon the questions of law arising in the case, was in accordance with all the settled law in England and in this country, and was also in accordance with common sense and sound policy. Charter of Naugatuck Railroad Company, Private Acts, 1845, page 89. 8 Me. & Wels. R., 421. 3d Eng. L. & Eq. R., 497; 18 Eng. L. & Eq. R., 533, 537. Angel on Carriers, sec. 95, 97. 1 E. D. Smith's R., 234.

ELLSWORTH, J. This is an action against the defendants, as common carriers, by a certain railroad, which has its northern terminus at Winsted, and its southern at Bridgeport. It appears, that at Wolcottville, which is on the line of the road, on the 25th day of July, 1852, the defendants received from the plaintiff, seven bales of leather, marked for New York, part of it to Rich & Loutrel, and a part to Cook & Mann. No money was paid, or agreed to be paid, for carrying the leather to any specific place, and nothing was said by either of the parties, as to what was expected of the defendants, beyond what is implied from a receipt, that the

defendants received the bales "for transportation," and which described them by the marks already mentioned. It is found and not denied, that the bales were carried to Bridgeport, the southern terminus of the defendants' road, and there delivered to the steamer Alice, a boat in all respects suitable and proper, for transporting freight between that place and New York, nor is any claim made that the defendants did not perform all they undertook to perform, in a proper and unexceptionable manner; and so were not liable after the bales were delivered to the steamer, unless it was their duty to carry them themselves, or see them carried to New York: and further, there was no evidence or claim, that there was any connexion in business between the defendants and the steamer, except, that in the customary way of forwarding freight, they delivered goods to each other from time to time, as they were marked for transportation, no matter to what place, whether New York, California, Europe or Asia.

The leather was burned on board the steamer, with the boat itself, in the harbor of Bridgeport, on the night of the 25th of July, 1852, and it is to recover this loss the plaintiff has sued, and recovered the full value of the leather.

To this verdict and judgment, the defendants make several objections. 1. That the verdict is against evidence, and should not be permitted to stand. A majority of the court think that this claim is well founded, and must prevail. We believe that the jury adopted some false principle in their deliberations, or were prejudiced, or were influenced by improper considerations, however honest or unconscious they might have been. While we are ever reluctant to disturb a verdict, because we may happen to differ from the jury upon matters of fact, or should ourselves have different inferences from the evidence, yet, the case may be so palpable and glaring, as to require us to do it, and especially where we see that they must have acted under erroneous views of the law. Now, taking all the evidence of the plaintiff together, all from which he claimed to have proved that the

defendants had agreed to carry the goods to New York, and not merely to Bridgeport, the force of it is very weak indeed, and is most inadequate in our view, to uphold this verdict. Besides, it must be remembered that under the charge of the court, the jury must have found, and professedly did find, that there was a contract to carry by railroad to New York, which, as we shall hereafter show, is not only without evidence, but against all the evidence. It is important in the outset, to bear in mind, that the defendants were created and known as the Naugatuck Railroad Company, having a charter for a railroad through the valley of the Naugatuck, and were in fact well known to the plaintiff, and equally so to the public, to be chartered for a railroad terminating southerly at Milford or Bridgeport. Nor is it pretended, that in fact, they were, or ever have been, common carriers, otherwise than over their own road. It is said, they might have been carriers beyond, under a certain general clause in their charter, and therefore they might hold themselves out and agree to become carriers beyond Bridgeport, which, however, the defendants deny, and of which we will say more hereafter; but the great fact is not denied that the terminus of the defendants' road is, on the south, at Bridgeport, which is enough, in our judgment, to create a *prima facie* case, that the defendants are to carry their freight to Bridgeport, and thence to forward it according to the course of business, which throws the burden of proof on the plaintiff, if he claims there was a special contract, different from what the law implies. What is there now, in this case, to prove that there was such a special contract as the plaintiff claims? The plaintiff relies on three circumstances: the bales being consigned to New York; the receipt given to transport; and the advertisement, published in two newspapers. Let us examine these circumstances, and we are more willing to do this, because, if we do not mistake, there is a most important principle of law involved in the case; a principle of great practical importance to commercial men and to persons who

are acting as carriers by land or by water. At this day, vast amounts of property are constantly in the course of transportation from place to place, within the country, and often beyond it; and it is not to be endured that there should be uncertainty, as to the law where the duty of one carrier ends, and that of another begins.

It is obvious, that wherever the different carriers, throughout the route, are connected in the business of transportation by some joint undertaking, or partnership, there can be no difficulty, in case of a loss which happens on any part of the line, but the question arises, where this is not the case, what is the law then; and what is it, where the charters of railroad companies or steamboat companies are limited and defined, in the character or mode of their business, and the area and distance within which they may carry it on ? Is the first carrier to be held to be the principal carrier, and all the others his agents and servants, or are they severally, to be held to be principals, each answerable for losses on his own part of the route, and not otherwise ?

To return, then, to the three circumstances mentioned. Does the ultimate destination of freight left at a depot, for transportation, prove a special promise by the carrier, that that company will themselves carry it, or be responsible that it shall be carried to any consignee, whose name is on it, as it may be, to a person in Oregon, or in the mountains of Thibet ? We emphatically ask, could the defendants have refused to transport these bales as far as their road extends, although they were marked to go to a place beyond it ? We think not; and if so, is it not obvious, that the mere receiving them to transport is no evidence that they undertake to carry them beyond the line of their road? And does the receipt add anything to the proof? We think not. It is a mere admission of the fact, that the bales have been received, and is evidence for the plaintiff, which he will possess, of the purpose for which they were received, *viz.*, to be transported, not to be sold, or consumed, or otherwise appro-

priated. But this does not touch the question of distance, or duty, beyond the defendants' road. The writing is just as consistent with the defendants' claim, as the plaintiff's, and hence, can not be *prima facie* evidence of anything beyond the fact that the bales were received, to be forwarded, and the receipt proves nothing more than what the law would imply, from the reception alone, *viz.*, a promise to carry them to Bridgeport, the end of their road, and thence forward them by the usual conveyance, if not otherwise directed.

Since the argument, the 1 Gray R. has come to hand, in which we find the case of *Nutting* v. *Conn. R. R. Co.*, p. 502, where the court decide that a railroad corporation, receiving goods for transportation to a place, situated beyond the line of their road, or on another railroad, which connects with theirs, but with the proprietors of which they have no connexion in business, and taking pay for the transportation over their own road only, are not liable, in the absence of any special contract, for the loss of the goods, after their delivery to the proprietors of the other railroad. The language of the receipt, in that case, is much stronger than it is here; it is not merely to transport, but to "transport to New York." The court say: "The obligation is nothing more than to transport the goods safely to the end of their road, and there deliver them to the proper carriers, to be forwarded towards their ultimate destination"—"if they can be held liable for a loss that happens on any railroad, besides their own, we know not what is the limit of their liability. If they are liable in this case, we do not see why they would not be liable, if the boxes had been marked for consignees in Chicago, and had been lost between that place and Detroit, on a road with which they have no more connexion than they have with any railway in Europe." It was further claimed, in that case, that the receipt proved a special contract to carry to the place of destination; but the court say : "We can not so construe the receipt ; it merely states the fact, that the boxes had been received, for transportation

to New York, and the plaintiff might have proved that fact, with the same legal consequences to the defendants, by oral testimony, if he had not taken a receipt. That receipt, in our opinion, imposed on the defendants, no further obligation than the law imposed without it." In the late case of *Hood* v. *The New York & New Haven R. R. Co.*, which has been twice before this court, we had occasion to express our views upon contracts raised by implication, against such corporate companies, from their receiving passengers, going to places beyond the terminus of their road; and we then granted a new trial for a verdict against evidence, which was, in our judgment, very much stronger against the railroad company than is the evidence, in the present case; and we further intimated that the recent English cases which were then urged upon us, as they have been at this time, were not law, unless there is a distinction between an implied contract to carry freight, and a contract to carry passengers. We rejected the law of those cases, in their application to passengers, and we are ready to do it, in relation to freight. We can not think that a railroad taking goods and nothing more, to transport, proves a promise to carry them to any place, to which they are consigned, either in, or out of, the country, and this too, whether there be public or private conveyances or not, to the place designated. If those cases can be placed on circumstances peculiar to the modes of conducting business in England, they may, in that way, be reconcilable with the practices and understanding of men of business, but otherwise, they seem to us, altogether unreasonable and severe. The same view of those cases is expressed by the court in Massachusetts, in the case already referred to, where, after commenting on them with dissent, they make reference to the case of *Hood* v. *The New York & New Haven R. R. Co.*, as containing the correct law. They use this language, on page 505: "The plaintiff's counsel relied on the case of *Muschamp* v. *L. P. T. Railway*, 8 M. & W., 421, in which it was decided, by the court of exchequer, that when a rail-

way company take into their care a parcel, directed to a particular place, and do not, by positive agreement, limit their responsibility to a part only of the distance, that is *prima facie* evidence of an undertaking to carry the parcel to the place to which it is directed, although that place be beyond the limits, within which the company, in general, profess to carry on their business, as carriers." *Watson* v. *A. N. & B. Railway*, 3 Eng. L. & Eq., 497. We can not, say the court in Massachusetts, concur in that view of the law, and we are sustained in our dissent from it, by the court of errors in New York, and by the supreme courts of Vermont and Connecticut. *Van Santvord* v. *St. John*, 6 Hill, 157. *F & M. Bank* v. *Champlain T. Company*, 18 Ver., 140, and 23 Ver., 209. *Hood* v. *New York & New Haven R. R. Co.*, 22 Conn. R., 1.

Besides the evidence commented on, there remains only the defendants' advertisement, which was published in two newspapers. This notice, when justly considered, in our judgment, furnishes but little, if any, evidence of a special contract to transport, beyond what the law itself implies. It gives notice how all freight received on the defendants' road will be arranged and classified, in the defendants' way-bill, and generally, that the facilities for transporting freight are greatly improved, and may be considered certain. Circumstances of a like character, only much stronger, were pressed upon us, in the case of *Hood* v. *The New York & New Haven Railroad Co.;* but they were then held to be equivocal and indecisive, and we did then, as we do now, attach but little importance to such general testimony, especially when, if all other evidence in the case is taken into consideration, such general testimony is fully explained.

Again, under the charge of the court, it was necessary for the jury to find, that the defendants undertook, not only to carry the leather to New York, but to carry it there by railroad. The judge instructed them, that this court, in a recent case, had decided, that a railroad company had not power

to transport, otherwise than by railroad, and hence, that the directors or agents, in the present case, could not make a promise to carry by steamers ; that such a promise would not bind the company, and hence, if they found the promise was to carry the plaintiff's goods by steamers, the defendants were not liable to the plaintiff, and the verdict must be for the defendants. Now, under these instructions, we are at a loss to discover any serious question, for if the comments already made on the plaintiff's evidence are correct, there was absolutely no serious evidence of a promise, at all, to carry by railroad to New York, but the proof was clearly to the contrary, and when all of it is taken together, it is quite obvious that the belief, and understanding, and positive agreement, between the parties, was, that the plaintiff's goods were not to go by railroad, but by steamers. H. B. Richards, agent of the defendants, at their depot, in Wolcottville, testifies that, about a year before these goods were lost, Elisha S. Elmore, brother and agent of the plaintiff, ordered the witness "to send all their goods to Bridgeport, and thence, by steamboat, to New York," and he testifies further, that said Elisha enquired of him, which way would be the cheapest, and the witness informed him, that the cheapest way was the steamboat, and then, said Elisha gave the directions already stated. This testimony is not, we think, impaired, or impeached. The witness further testifies, that a few days after said directions, he saw the plaintiff himself, and told him the defendants were sending his goods, by his brother's orders, by the boat, and that the plaintiff replied, " It is all right." This is not seriously contradicted, except by a kind of negative evidence of the plaintiff himself. The witness further testifies, that a hand-bill, in the words following, " Notice to Shippers. To avoid errors in the transhipment of freight to New York, all freight destined to that place will be sent hereafter by steamers, unless marked by railroad to New York. Bridgeport, April 1st, 1842. Philo Hurd, Sup't," was posted up, on the 12th of the same month,

in a conspicuous place, in the depot at Wolcottville, and also, that he sent a copy to each of their principal shippers, and he believes to the plaintiff; that since the 16th June, 1852, the company had conformed to said notice, and constantly sent freight by the steamer; that the plaintiff never gave different orders, and was constantly receiving his freight, sent from New York, by the steamer, and saved thereby one cent freight on a hundred pounds. So, A. N. Dennis testifies, that the plaintiff said he had directed the defendants to send his goods by the cheapest way. So we think it is fairly inferable from the testimony of Clark N. Dow, that the plaintiff had seen the hand-dbill, before the leather was shipped. But let this be as it may, proof of knowledge is not a pre-requisite, for, although a notice by a common carrier, that he will hold himself responsible, only under certain limitations, may not avail him, without evidence of a mutual agreement to that effect, the law is otherwise, when the question is, the capacity in which, and purpose for which, goods are received. So, too, the shippers are supposed to know, and to assent to the general customs, and modes of business, pursued by those they employ; and the defendants' evidence on the custom, is complete. Upon the whole, we are quite satisfied, that the verdict is manifestly against evidence, and that for this reason, there must be a new trial.

The defendants further insist, that the court erred, in instructing the jury, that the delivery of the goods to the defendants for transportation, and their giving a receipt, to that effect, was *prima facie* evidence of an undertaking to carry the goods to New York, that being the place of their ultimate destination. We have already expressed the views of a majority of the court on this point, and will not recapitulate. Were the English cases cited, held to be good law in this state, we should not differ from our learned brethren; but we conceive that they are not law, either in this, or any of the states in the Union: certainly they are not, in the

states mentioned, and we know not that they are in any of them.

Another question decided below, which has been somewhat argued here,—but not as the chief point, as the defendants were confident they must have a new trial on other, and obvious grounds,—has been mentioned: we mean, the incapacity of the defendants to become common carriers beyond the line of their own road, and, if they can not be, then the supposed promise to become such, is without their charter and void, as to the company certainly, however it may be as to the directors and agent, who made the promise. The power of the company, in the defendants' views, is supposed to be derived from that clause of the charter, which is to be found near the end of the first section, in these words, "with permission also to make any lawful contract with any other railroad corporation, in relation to the business of said company." The judge decided, that, under this clause, the defendants could become common carriers to New York, and could undertake to become such, whether, in fact, they had taken the necessary steps for it, or not. If this is so, then the defendants insist that, by analogy, the agents of the company can make the company carriers to any, and every other part of the country wherever the directors can take a lease of a railroad, or stipulate with the directors of it, that they will run the road on their account, or at least in part, in behalf of the defendants' freight and passengers. On the other hand, the defendants insist that this is not the true construction and intention of this clause, and judging from its position, and connexions in the charter, it is meant, to give a liberty, which is incidental only to the exercise of other specific powers of the charter, as a limited one, restricting the company to the Naugatuck valley, with outlets and termini at New Haven, Milford or Bridgeport; that the legislature meant only to authorize them to unite with the New York and New Haven Railroad Company, or any other company, in a common depot building or the use of their road, and cars, or the run-

ning of the defendants' cars on their road, or the like, within the limits of the defendants' road; for else the defendants will not be a company under a limited and defined charter, or within located limits, but a sort of express company, with power to extend their business throughout the country. We state the question, and in a brief form, the claims of counsel as we understand them, but as our decision is placed on other grounds, we do not dwell on them, and do not mean to be understood as expressing any opinion.

We advise a new trial.

In this opinion the other judges concurred, except HINMAN, J., who was disqualified, and WAITE, C. J., who gave a dissenting opinion.

WAITE, C. J.    The defendants, in this case, gave public notice, in the newspapers, "to freight shippers," "that freight would be "way-billed from each station" on their road, "for New York, New Haven and Bridgeport." After this notice had thus been publicly given, the plaintiff delivered to them, at their station in Wolcottville, a quantity of leather to be transported to New York, for which they gave him two receipts. One was in these words: "Received, for transportation, in good order, from J. D. Elmore, five bales leather, 1,297 lbs., consigned to Cook & Mann, N. Y." To this receipt their company name was affixed, by their agent. The other receipt was of the same tenor, differing only in the quantity of leather, and in the names of the consignees.

The goods were transported to Bridgeport, placed on board a steamer, and afterwards destroyed by fire. The action was brought to recover for the loss.

Upon this evidence, the judge, upon the circuit, instructed the jury, that the delivery of the goods to the defendants, and taking their receipts for the same, without any thing further between the parties, was *prima facie* a contract to

carry the goods to the place of destination, according to the marks and directions upon them.

The jury having returned their verdict in favor of the plaintiff, it is now said that the instruction of the court, and the verdict of the jury, are both wrong. But to this assertion, I can not yield my assent.

The receipts given by the defendants are undoubtedly evidence of a contract of some sort, and were so intended by the defendants when given. And if they do not import a contract to transport the goods to New York, what contract do they import? Not to carry to Bridgeport, any more than to Waterbury, or any other place on their route.

But say the defendants, New York is beyond the termination of our road, and we could make no contract to carry beyond it. Why then did you publish to the world that you would "bill" goods to New York, if you did not intend to carry them there? And when the goods were delivered to you, consigned to merchants in New York, in compliance with your call upon freight shippers, why did you give your receipts for the goods, to be transported in good order, without specifying the contract you intended to make?

Had the goods been consigned to persons in Waterbury, in Seymour, in Derby, or any other place on the line of the defendants' road, could there be a doubt but that receipts, like the present, would import a contract to deliver at the place designated? A delivery in such case at any other place would clearly be a violation of the contract. A delivery at Bridgeport, would render the defendants as liable as a delivery in New York.

The case of Nutting against The Connecticut River Railroad Company, is relied upon by the defendants, as supporting their claim. 1 Gray's R., 502. But there is a material distinction between that case and the present. There a practice had existed for the defendants to carry goods consigned to New York, only as far as Springfield, the termina-

tion of their road, and they were paid for carrying the goods only to that place.

In the present case, had there been a practice on the part of the defendants to transport goods no further than Bridgeport, and had the plaintiff paid them for the freight to that place, such facts would have rebutted the *prima facie* evidence furnished by the receipts alone, and have shown what the real understanding of the parties was. In the language of the charge, there would have been "something more between the parties."

The principle, laid down by the judge on the circuit, is in precise conformity with the English decisions, and is fully sustained by them. Such evidence is not considered as conclusive evidence of a contract to carry the goods to their place of destination, but merely as *prima facie* evidence of such an undertaking, liable to be controlled by the other evidence in the case.

But the main question involved, is, whether a railroad corporation has power to make a valid contract for the transportation of goods, to any place beyond the termination of their road. A majority of this court are of opinion, that such a corporation has no such power, and upon that ground they hold the verdict to be wrong.

That question, in my judgment, is one of very great importance in this country, covered as it is, with a vast network of railroads, constantly increasing in number, and moving, annually, an immense amount of freight, to and from almost every part of the Union. If the present railroad corporations do not possess the power to make such a contract, as incidental to their general powers, in my opinion, the business wants of the community, and especially of mercantile men, must soon demand legislative interference and a grant of the requisite authority. Indeed, I do not see how the great business operations of the country can safely be carried on without it.

The question is not, whether a railroad company can be

laid under any obligation to transport goods beyond the line of their road, unless by their voluntary consent; but whether they can unite with other railroad companies, having a continued line between two places, by which they can contract for the transportation of goods between those places.

No company would naturally enter into any such arrangement, unless for the promotion of their interests and increasing the legitimate business upon their road. And it is easy to conceive, that such an arrangement, in many cases, might be made, respecting the division of the freight money, and the speedy and safe transportation of goods, as would be highly beneficial to all concerned, and materially increase the business on their route.

A merchant, residing in Cleveland, Toledo, or Chicago, purchases goods in the city of New York, which he wishes to send to his place of business. He enters into a contract with a railroad company for their transportation, not to any given point on the route, but for the whole distance. He delivers the goods to the company, and they are taken and locked up in freight cars. He does not accompany them, and often sees and hears nothing more of them, until they are delivered to him at their place of destination. The cars in which they are placed are often run over roads, belonging to different companies, to save the trouble and expense of a change of cars.

If the goods are lost or damaged on their route, he ordinarily has no means of determining where, or in whose custody, the injury accrued. The trouble and expense of ascertaining that fact, in many cases, would amount to more than the whole damage. As a prudent, cautious man, he would be unwilling to trust his goods to the custody of others, unless he could find some person, or company, that would be responsible for their safe delivery.

But we are not left to mere speculation upon this subject. The question has repeatedly been before the higher English

courts, and they have uniformly holden that railway corporations have power to enter into contracts, for the transportation of goods beyond the termination of their roads, and that the receipt of them, marked for a particular place, is, *prima facie,* a contract to carry to that place. *Muschamp* v. *The Lancaster and Preston Junction Railway Company,* 8 M. & W., 421. *Watson* v. *The Ambergate, Nottingham and Boston Railway Company,* 3 Eng. L. & E. R., 497. *Scotthorn* et al. v. *The South Staffordshire Railway Company,* 18 Eng. L. & E. R., 553. *Crouch* v. *The London and North-Western Railway Company,* 25 Eng. L. & E. R., 287.

In the first case cited, a parcel was delivered to the defendants, directed to a person at a place in Derbyshire, beyond Preston, the termination of the defendants' road. The person, who delivered it, offered to pay for the transportation, but the defendants' book-keeper said it had better be paid by the person to whom it was directed. The parcel was carried to Preston, and there delivered to the next company on the route, and was afterwards lost. It was holden that the defendants were liable for the loss, and that the receipt by them, under the circumstances, was *prima facie* evidence of a contract to carry it to the place of its destination.

Lord Abinger, in the course of his remarks, said, "The taking charge of the parcel is not put as evidence of the contract, sued on by the plaintiff. It is only *prima facie* evidence of it; and it is useful and reasonable for the benefit of the public that it should be so considered. It is better for those who undertake the carriage of parcels, for their mutual benefit, that they should arrange matters of this kind *inter se,* and should be taken, each to have made the others their agents, to carry forward." And Rolfe, Baron, said, "The construction we are putting on the agreement is not only consistent with law, but is the only one consistent with common sense, and the convenience of mankind." "Any other construction would open the doors to incalculable inconven-

iences." "All inconvenience is one way, and there is no authority the other way."

The principles, recognized in that case, were fully sanctioned by the court in the next case cited. Earle, J., referring to the case, said, "I think it was there properly decided, that where goods are received at one terminus for conveyance to another, the company are answerable for all the intermediate termini, and the receipt of such goods is *prima facie* evidence of such liability."

In the succeeding case, the defendants' counsel admitted that the principles recognized in those cases were so well settled, that their correctness could not be impugned. They fully sustain both the charge of the court and the verdict of the jury, in the present case, and, in my opinion, are founded in good sense and the convenience of mankind, and I see no good reason for departing from them, sanctioned as they are by courts of the highest authority.

But the case of *Hood* v. *The New York and New Haven Railroad Company*, is also relied upon by the defendants. 22 Conn. R., 1, 502. That was a suit brought to recover damages for an injury to the person; this is for the loss of goods. The judge who delivered the opinion, in that case, recognized the distinction. He says, "But if we are wrong in this, it does not follow, that the doctrine of the English cases, as to freight, is to be applied to passengers. Passengers take care of themselves." If a passenger is injured upon a railroad, he knows where the injury happened, and can generally ascertain, without difficulty, what company is in fault. Not so with the owner of goods, which have been damaged on a long railroad route, owned by several companies.

The decisions in that case were made upon decided opinions of the members of this court, and are of no binding efficacy, beyond the questions there involved. And if they are to control the law, in this state, in relation to the transportation of passengers, they do not preclude us from deciding

questions, relating to the transportation of freight, upon principle and authority.

For these reasons, I think the verdict of the jury ought not to be disturbed.

New trial to be granted.