## Case No. 10,001.

### MYRICK v. MICHIGAN CENT. R. CO.

[9 Biss. 44; 7 Reporter, 229; 11 Chi. Leg. News, 151.] [1]

Circuit Court, N. D. Illinois, Jan., 1879. [2]

CARRIERS—LIVE STOCK—NECESSARY ACCOMMODATIONS — RAILROAD COMPANIES — CONNECTING LINES—THROUGH BILL—CONTRACTS—CONSTRUCTION.

1. In the construction of a contract the court will ascertain what the surrounding circumstances and facts were, in order to determine the intention of the parties and the full legal purport of the contract.

2. In this case it was held, where the defendant received at Chicago certain cattle consigned to Philadelphia, giving shipping receipts therefor, that these receipts constituted through contracts, by which the defendant was liable for the proper transportation of the cattle beyond the line of its own road.

3. In such case it was the duty of the defendant to notify each of the carriers beyond its terminus of the requirements of the contract, and each of them became the agent of the defendant for the purpose of executing the contract and seeing that its terms were complied with, and the delivery of the cattle to a stock yards company by the last carrier, made the managers of the yards the agents of the defendant, which is liable for any wrongful or negligent delivery of the cattle by them.

4. Railroad companies which become carriers of live stock must provide accommodations, whereby the stock can be safely and properly kept and cared for until a delivery can be made to the consignee according to the terms of the shipment.

5. No mere usage between the consignor and carrier concerning the delivery of the cattle at the end of the line of transportation, contrary to the terms of the contract, could affect the rights of an assignee of the bill of lading, when such usage was not known to him.

[This was an action by Paris Myrick against the Michigan Central Railroad Company to recover damages for a breach of contract.]

Larned, Ryerson & Larned, for plaintiff.

[1] [Reported by Josiah H. Bissell, Esq., and here reprinted by permission. 7 Reporter, 229, contains only a condensed report.]

[2] [Reversed in 107 U. S. 102, 1 Sup. Ct. 425.]

[1] [Reprinted by permission.]

A. L. Osborn and Wirt Dexter, for defendant.

BLODGETT, District Judge (charging jury). This suit is brought to recover damages for a breach of two contracts which the plaintiff claims he made with the defendant, as common carrier, one on the 7th, and the other on the 14th of November, 1877, for the transportation of beef cattle from Chicago to Philadelphia. The allegation on the part of the plaintiff is that on the 7th of November, 1877, he delivered to the defendant at the stock yards in this city, and the defendant there accepted, two hundred and two head of beef cattle to be transported by the defendant as a common carrier from this city to Philadelphia, Pennsylvania, and there delivered to the plaintiff or his order; that plaintiff received from the defendant a bill of lading or receipt for said cattle, and that he duly indorsed the same, to the Commercial National Bank, as security for a loan of money advanced by said bank to the plaintiff to pay for said cattle, and thereby the defendant became bound to safely transport said cattle to Philadelphia, and there deliver them to said bank or its proper agents; that the defendant failed to perform its contract and neglected and failed to deliver the cattle to the bank or its agent, whereby the cattle were wholly lost to the plaintiff and said bank.

It is also alleged that a similar contract in all respects was made by the plaintiff with the defendant on the 14th of November, for the transportation of another lot of two hundred and two head of beef cattle, and that the defendant has failed to perform said contract in the same manner it failed to perform the first. The defendant contends:

First. That it owns and operates a railroad from Chicago to Detroit and no further, and while it received the cattle and carried them on its own line as far as Detroit, it did not undertake to transport them beyond that point, and that the obligation to the plaintiff was fully performed when it delivered the cattle to the connecting carrier at Detroit, for their place of destination.

Second. That even if the contract with the plaintiff was for the transportation of the cattle in question from Chicago to Philadelphia, it fully performed its undertaking in that behalf by the delivery of the cattle to the North Philadelphia Drove Yard Company, and that the loss to the plaintiff occurred through the neglect of said drove yard company, for which defendant is not responsible.

It is conceded that the plaintiff did ship by the defendant's road, the two lots of cattle in question; that the cattle passed over the defendant's railroad to Detroit and from there over connecting railroad lines to Philadelphia, reaching the latter place by what is known as the North Penn. Railroad, and that the North Penn. Railroad Company delivered the cattle to the North Philadelphia Drove Yard

Company, a corporation or firm owning and managing certain cattle yards in the vicinity of Philadelphia, fitted up with conveniences for receiving and yarding live stock; that the first lot of said stock arrived at the drove yards on the 11th of November, and the last on the 18th of November, and that the officers or managers of the drove yards delivered the cattle to J. and W. Blaker, without the surrender of the receipt or bill of lading which the defendant had issued to Myrick, and which Myrick had indorsed to the bank, and without the order of Myrick. The following is a copy of one of the shipping receipts given by defendant to plaintiff, the other being like it except as to date:

"(Michigan Central Railroad Company, Chicago Station, Nov. 7, 1877.)

"Received from Paris Myrick, in apparent good order, consigned to order Paris Myrick. Notify J. and W. Blaker. Philadelphia, Pa.

| Articles. | Marked. | Weight and Measure. |
|---|---|---|
| Two hundred and two (202). | Cattle. | 240,000. |

"Advanced charges, $1,200, marked and described as above (contents and value otherwise unknown) for transportation by the Michigan Central Railroad Company, to the warehouse at ——.

"This receipt can be exchanged for a through bill of lading.

"Notice.—See rules of transportation on the back hereof. Signed,
"Wm. Geagan, B. Agent.

"Indorsed, Paris Myrick."

The only rule on the back of the receipt which affects this question, is rule 11, which is as follows:

"Goods or property, consigned to any place off the company's line of road, or to any point or place beyond its termini, will be sent forward by a carrier or freightman, when there are such, in the usual manner, the company acting, for the purpose of delivery to such carrier, as the agent of the consignor or consignee, and not as carriers. The company will not be liable or responsible for any loss, damage or injury to the property, after the same shall have been sent from any warehouse or station of the company."

It is claimed by the plaintiff, that by the terms of the shipment it became the duty of the defendant as a common carrier, to notify J. and W. Blaker, of the arrival of said cattle at the place of destination, and that no rightful delivery could be made, except upon the order of Myrick and the surrender of the bill of lading, but that without the order of Myrick the cattle were wrongfully delivered to the Blakers, who sold them and converted the proceeds to their own use, whereby the cattle were wholly lost to the plaintiff and the bank which had advanced money on them

The first question is, did the defendants make a contract to transport these cattle from here to Philadelphia? It was competent for

the defendant as a common carrier, to contract for the transportation of these cattle beyond its own terminus, and to Philadelphia. If such a contract was in fact made, the carriers beyond the defendant's terminus, that is, beyond Detroit to the place of destination, became the agents of the defendant to complete the contract, and the defendant is liable for any breach of it whereby the plaintiff sustained damage. Considerable discussion has been had before the court upon the questions of law raised, whether these receipts are, or are not, a through contract or bill of lading. At first I was inclined to submit this as a question of fact to the jury; that is, to submit all the testimony, including the shipping receipts, and allow the jury to say, as a question of fact, whether the defendants did contract to transport these cattle through to Philadelphia, or not, but upon further reflection, I have concluded that this is solely a question of law for the court.

In construing a written contract, courts have the right to hear, to a certain extent, parol evidence as to the circumstances under which a contract was made, for the purpose of putting themselves in the place of the contracting parties, and determining the purport and effect of the language used; that is, the court has the right to ascertain what the surrounding circumstances and facts were, in order to determine the intention of the parties, and the full legal purport of the contract made. Perhaps the rule asserting the right of the court to look into the surrounding facts connected with the making of a contract, for the purpose of determining its meaning has never been more lucidly stated than by Mr. Justice Caton, of the supreme court of the state of Illinois, in the case of Doyle v. Teas, 4 Scam. 256: "But the true rule, clearly deducible from the cases, I think, is where the language is of such a character as to show that the parties had a fixed and definite meaning which they intended to express, and used language adequate to convey that idea to persons possessed of all the facts which they had in view at the time they used the language, it then becomes the duty of the court to learn those facts, if need be, by parol proof, and thus, as far as possible, by occupying the place of the parties employing the expressions, ascertain the sense in which they were intended to be used."

Now, taking into consideration the circumstances, as shown in the proofs, surrounding the making of these shipping receipts or bills of lading, I come to the conclusion, and say to you, gentlemen of the jury, that they are through contracts, whereby the defendant agreed to transport the cattle in question from Chicago to Philadelphia, and there deliver them to the order of Paris Myrick, and to notify J. and W. Blaker of their arrival. This was the undertaking on the part of the defendant with the plaintiff, and with whoever might be made the assignee or holder of this contract.

It thus became the duty of the defendant, if the defendant's road did not reach the place of destination of the property, to properly notify or inform each of the carriers beyond the defendant's terminus, of the terms upon which that shipment was made, and each of the carriers beyond the defendant's terminus is, for the purpose of executing this contract, the agent of the defendant, and as completely bound to carry out the terms of the contract as if defendant's road extended from here to the place of destination, and the agents of the last carrier that transported these cattle are the agents of the defendant for the purpose of executing this contract and seeing that its terms were complied with.

This, then, being a through contract, the only question is, whether there has been a breach of it. The defendants insist that owing to the peculiar nature of live stock as freight, it is not to be considered as ordinary merchandise; that it must be yarded, watered and fed, not only along the route, but at the terminus, or place of destination, and that peculiar accommodations are required for that purpose, such as railroad companies do not usually have; and that the plaintiff knew when he shipped this stock that the railroad at the place of destination had no facilities of its own for caring for cattle, but that its course of business was to deliver to this drove yard company, and that, therefore, the contract of carriage was completed when the delivery was made to the drove yard company. Undoubtedly this kind of freight must have accommodations adapted to it, and railroad companies that become carriers of live stock may provide such accommodations themselves, or may adopt those provided by other independent companies or persons. But if they adopt the yards of another, they thereby make them their own for the purpose of performing their contract, the same as if they were their own depot, and the managers of the yards their servants and agents. As with merchandise, they are bound to provide a depot or freight house in which the goods may be safely kept for a reasonable time until the consignee can take them away; so, in regard to cattle, they must make some preparation whereby they can be safely and properly kept and cared for, until a delivery can be made to the consignee, according to the terms of the shipment. For this purpose, as I have already intimated, the railroad company, as a common carrier, had a right to make this drove yard its warehouse or place for the storage of these cattle, and the drove yards were required to hold the cattle, as the railroad company itself would have been compelled to hold them until the consignee called for them, or until a reasonable time elapsed. The cattle being, of course, expensive to keep, they would be kept at the cost of the consignee, and the charges upon them would be additional charges to be paid whenever they were taken away; and if they were detained an unreasonable time, then, under

the law pertaining to the rights and duties of common carriers, the drove yard company would be entitled to sell the cattle as perishable property for their advances and charges thereon. They would not be obliged to keep them indefinitely, but they would be obliged to keep them a reasonable time, the same as a railroad company is obliged to keep your goods a reasonable time after they arrive at the terminus in order that you may pay the charges and take them away. So, that, as I have already instructed you, the defendant, by its contract, agreed to transport these two lots of cattle to Philadelphia, and deliver them to the order of Paris Myrick there, and to notify J. and W. Blaker; and it being admitted, or at least not disputed, that Myrick had duly assigned and delivered the shipping receipts or bills of lading given him by the defendant to the Commercial National Bank, to secure the advance of money, if you are satisfied from the proof that the railroad companies along the route, which transported the cattle to Philadelphia, delivered them to the drove yard company mentioned in the proofs, and that the persons in charge of the said drove yard did, on the day after the arrival of each of the said lots of cattle, deliver them to J. and W. Blaker, without the order of Myrick, and that the plaintiff and the Commercial National Bank of this city thereby lost the said cattle, or the benefit of them, or the proceeds thereof, then the defendant is liable to the plaintiff in this action; it being the duty of the defendant, if it or its agents, the railroad company at the terminus, delivered the cattle to the drove yard company, to accompany the cattle with the proper directions for their being delivered only to the order of Myrick, and if the railroad company failed to properly direct the drove yard company, or if they had been properly directed, and the drove yard company had delivered them improperly, then the defendant in either event, would be liable. That is, it makes no difference whether the North Penn. Railroad Company, which made the delivery to the drove yard company made the mistake, or whether the drove yard company made the mistake and delivered the property wrongfully; in either event the defendant is liable, as both these parties were agencies by which the defendant undertook to complete its contract.

It is contended by the defendant, that by the course of business growing out of a series of shipments by the plaintiff over the defendant's line to the same destination, a usage had grown up to deliver the cattle to the Blakers upon substantially such contracts as this, and therefore defendant is not liable, and upon this point I say to you, while the parties to a contract like this, may, by a long continued usage, change the mode of delivery, yet in order to warrant a delivery contrary to the terms of the contract, it must appear satisfactorily from the evidence, that the plaintiff knew that the terms had been changed at the terminus; and that in this case, if you believe from the evidence that the plaintiff assigned his bill of lading or receipt to the Commercial National Bank as security for a loan or advance of money, then no mere usage between the plaintiff and the defendant in that regard, contrary to the terms of the contract, would affect the rights of the bank as the holder of this bill of lading; that is to say, the bank had the right to have the contract executed according to its terms, unless the proof shows to your satisfaction that the bank had become cognizant of a usage by which the terms were changed, and acquiesced therein.

Then, gentlemen of the jury, the next question for you to consider will be the measure of damages. The evidence in the case, which is undisputed, I may say, shows that Myrick immediately upon receiving this bill of lading, that is, as soon as the two things could follow each other in the due course of business, repaired to the Commercial National Bank, where he received a discount or advance of money to the amount of $12,287.54 on the shipment of the 7th of November, and $12,448.12 on the shipment of the 14th of November; and that he drew drafts on J. and W. Blaker for these respective amounts, and secured their payment by assigning and delivering these bills of lading to the bank, and that these bills of lading went forward with the drafts to the First National Bank of Newtown, Pennsylvania, for collection. The evidence in the case tends to show, and perhaps does show without dispute, that Myrick, the plaintiff in this suit, bought the cattle in question for the Blakers; that is, he was the agent of the Blakers here for the purchase of cattle; he had no interest in the cattle further than to be reimbursed for the money which he borrowed, and became responsible for, to pay for the cattle. The undisputed proof shows that he was to buy the cattle in Chicago, make drafts upon the Blakers for the purchase money which he was to have discounted here, and pay for the cattle with the proceeds of the discount, and the drafts so made were to be secured by the transfer of the shipping receipts or bills of lading obtained from the railroad.

[And he was compensated for his services in the matter by a draw-back which he received from the railroads for furnishing them with this large amount of freight; the proof is so uncertain as to the amount of the draw-back, to which Myrick was entitled under his arrangement with the railroad, and as to whether he collected the draw-back from each railroad separately, or whether some one railroad paid him the whole and settled with the other members of the combination or line, that I do not think the jury can predicate any claim in favor of the plaintiff upon this draw-back item. It is left wholly uncertain, as I conceive it, by the proof, in the first place, as to how much

draw-back Myrick was to have, and secondly as to who was to pay it. I therefore direct you to exclude this item from the plaintiff's claim.][3]

If you are satisfied from the instructions that I have given, that the plaintiff is entitled to recover, his damages will be the amount of these two drafts, with interest thereon at six per cent. from the time the cattle were wrongfully disposed of; which was, in one case, by the undisputed testimony, the 12th of November, 1877, and in the other the 19th of November, the cattle having arrived in Philadelphia on Sunday in each case, and having been disposed of on the following Monday.

Verdict for plaintiff for $26,451.22.

NOTE. Where goods are delivered to a common carrier to be carried to a designated place, and the charges for transportation to that place paid in full, and the goods are received by the carrier without any contract limiting its liability, such carrier is responsible for the delivery of the goods at the place designated, notwithstanding its line ends before reaching such place, and the goods are delivered to another carrier in good order at the termination of its line. Adams Exp. Co. v. Wilson, 81 Ill. 339; Erie Ry. Co. v. Wilcox, 84 Ill. 239; Illinois Cent. R. Co. v. Copeland, 24 Ill. 332; Illinois Cent. R. Co. v. Johnson, 34 Ill. 389; Illinois Cent. R. Co. v. Frankenberg, 54 Ill. 88; Carter v. Peck, 4 Sneed, 203; Western & A. R. Co. v. McElwee, 6 Heisk. 208; East Tennessee & V. R. Co. v. Rogers, Id. 143; Louisville & N. R. Co. v. Campbell, 7 Heisk. 253; Angle v. Mississippi & M. R. Co., 9 Iowa, 487; Mulligan v. Illinois Cent. R. Co., 36 Iowa, 181; Bennett v. Filyau, 1 Fla. 403; Bradford v. South Carolina R. Co., 7 Rich. Law, 201; Kyle v. Laurens R. Co., 10 Rich. Law, 382; Mosher v. Southern Exp. Co., 38 Ga. 37; Southern Exp. Co. v. Shea, Id. 519; Mobile & G. R. Co. v. Copeland, 63 Ala. 219; Nashua Lock Co. v. Worcester & N. R. Co., 48 N. H. 339. But in Gray v. Jackson, 51 N. H. 9, the court held that whether the contract was for through transportation or not, so as to make the first carrier liable for a loss off of its line, was a question of fact.

The rule as stated above, though followed by many of the American courts, is called the "English rule," and was first laid down in Muschamp v. Lancaster & P. J. Ry. Co., 8 Mees. & W. 421, where it was held that when a carrier accepts for carriage goods directed to a destination beyond its own route, it assumes by the very act of acceptance, in the absence of any express contract upon the subject, the obligation to transport them to the place to which they are directed. Scothorn v. South Staffordshire Ry. Co., 8 Exch. 341; Crouch v. Great Western Ry. Co., 2 Hurl. & N. 491; Great Western Ry. Co. v. Crouch, 3 Hurl. & N. 183; Wilby v. West Cornwall Ry. Co., 2 Hurl. & N. 703; Watson v. Ambergate, N. & B. Ry. Co., 3 Eng. Law & Eq. 497; Collins v. Bristol & E. Ry. Co., 11 Exch. 790, 7 H. L. Cas. 194.

On the other hand, many of our courts have held that in the absence of contract, except such as is generally to be implied from the acceptance of goods for carriage, the obligation of the carrier extends only to the transportation to the end of its own route, and a delivery there to the next succeeding carrier to forward or complete the transportation. And this is frequently called the "American rule," in distinction to that laid down by the English courts. Nutting v. Connecticut River R. Co., 1 Gray, 502; Darling v. Boston & W. R. Co., 11 Allen, 295; Perkins v. Portland, S. & P. R. Co., 47 Me. 589; Skinner v. Hall, 60 Me. 477; Plantation v. Hall, 61 Me. 517; McMillan v. Michigan, S. & N. I. R. Co., 16 Mich. 120; Burroughs v. Norwich & W. R. Co., 100 Mass. 26; Baltimore & O. R. Co. v. Schumacher, 29 Md. 176; Condict v. Grand Trunk Ry. Co., 54 N. Y. 502; Van Santvoord v. St. John, 6 Hill, 158; Elmore v. Naugatuck R. Co., 23 Conn. 457; Hood v. New York & N. H. R. Co., 22 Conn. 502; Irish v. Milwaukee & St. P. Ry. Co., 19 Minn. 376 [Gil. 323]; Camden & A. R. Co. v. Forsyth, 61 Pa. St. 81; Crawford v. Southern R. Ass'n, 51 Miss. 222; Farmers' & Mechanics' Bank v. Champlain Transp. Co., 23 Vt. 186; Brintnall v. Saratoga & W. R. Co., 32 Vt. 665; Railroad Co. v. Manufacturing Co., 16 Wall. [83 U. S.] 318; Railroad Co. v. Pratt, 22 Wall. [89 U. S.] 123; Phillips v. North Carolina R. Co., 78 N. C. 294; Stewart v. Terre Haute & I. R. Co. [3 Fed. 768.]

Where goods are shipped on a "through freight contract," and in through cars, to a point beyond the line of the first carrier, such carrier is liable for loss beyond its line, under the terms of the bill of lading, notwithstanding the same limited the liability to loss on its own line. Toledo, P. & W. Ry. Co. v. Merriman, 52 Ill. 123. As to what constitutes a through bill of lading, and the duties of the carrier thereunder, consult Dixon v. Columbus, etc., R. Co. [Case No. 3,929]; Woodward v. Illinois Cent. R. Co. [Cases Nos. 18,006 and 18,007], and notes to those cases.

[In a writ of error, the case was taken to the supreme court, where the judgment of this court was reversed, and the case remanded for a new trial. 107 U. S. 102, 1 Sup. Ct. 425.]