THE NASHUA LOCK COMPANY v. THE WORCESTER & NASHUA RAIL-
ROAD COMPANY.

Where several common carriers are associated in a continuous line of transportation, and in the course of the business, goods are carried through the connected line for one price under an agreement by which the freight money is divided among the associated carriers, in proportions fixed by the agreement; if the carrier at one end of the line receives goods to be transported through marked for a consignee at the other end of the line, and on delivery of the goods takes pay for transportation through, the carrier, who so receives the goods, is bound to carry them, or see that they are carried, to their final destination, and is liable for an accidental loss happening in any part of the connected line.

ASSUMPSIT to recover for ten cases of locks. Plea, the general issue. The cause was submitted on the following agreed state of facts :

The cases were marked for Wiesbushhabatt & Co., New York, and were delivered to the defendants, as freight, at Nashua, N. H., to be transported over their road from Nashua to Worcester, Massachusetts, and there delivered to the Norwich & Worcester Railroad, to be forwarded by the usual course of transportation to New York city, and the entire freight from Nashua to New York was paid by the plaintiffs to the defendants.

The defendants are a corporation in New Hampshire and Massachusetts, owning and operating a railroad between Nashua and Worcester, which forms a connection with the Norwich & Worcester Railroad and

the line of steamers across Long Island Sound to New York from Norwich, Connecticut, known as the "Norwich & New York Transportation Company." The road of the defendants extends from Nashua to Worcester; the road of the Norwich & Worcester Railroad extends from Worcester to New London, from which point the boats of the Steam Boat Company run to New York. The defendants are accustomed to receive freight at Nashua destined and directed to New York and to deliver it to the Norwich Railroad as aforesaid. By an arrangement among these corporations the price paid for freight forwarded from Nashua to New York over the line is divided among them in accordance with an agreement.

The cases were forwarded by the defendants and by the Norwich & Worcester Railroad and delivered to the Transportation Company, and by them put on board the steamer "City of Norwich," which came in collision with a sailing vessel on the Sound, took fire, and with the cargo, including the ten cases, was consumed. The value of the steamer has been ascertained, and a pro rata share assigned to the plaintiffs, who have declined to accept it. In case judgment should be for the plaintiff, the value of the goods lost is to be determined by an auditor.

*A. W. Sawyer* for the plaintiffs.

I.  In the absence of any partnership connection between one route and another one united with it, persons receiving goods, as common carriers, continue to be responsible in that character, until the goods are delivered at the place to which they are directed, even if the place is beyond the limits of the place to which they are accustomed to carry and deliver. Angell on the Law of Carriers, chap. IV, sec. 95 or page 91 ; *Muschamp* v. *Lancaster Railway Company,* 8 M. & W. 421 ; *Weed* v. *Schenectady & Saratoga Railroad Company,* 19 Wend. 329, 534 ; 9 Barb. 317 ; 14 Barb. 524 ; *Bennett* v. *Filyow,* 1 Florida R. 403 ; *Van Santvoord* v. *St. John,* 25 Wend. 660, S. C. 7 Hill, 292. This case of *Van Santvoord* v. *St. John,* 6 Hill 157, is in favor of this same plaintiff, the freight from Nashua to New York having been paid by plaintiffs to defendants. *Garside* v. *Trent & Murray Nav. Co.,* 4 Tenn. 581 ; *Ackley* v. *Kellogg,* 8 Cow. 223 ; *Bradford* v. *S. C. R. R. Co.,* 7 Rich. 201.

II.  The defendants did not undertake to limit their liability, therefore they cannot escape from the obligation to deliver according to its destination. *Parker* v. *Flagg,* 26 Maine 181 ; *Farmers' & M. Bank* v. *Champlain Trans. Co.,* 23 Vermont 209 ; *Hood* v. *New York & New Haven Railroad,* 22 Conn. 1 ; *Rut. & Bur. R. R. Co.,* 27 Vt. 110.

III.  The consignor is not compelled to inquire how many corporations make up the entire route by which the goods are to be carried, nor, having ascertained this, to determine at his peril, which of the corporations has been guilty of the negligence. *Foy* v. *Troy & Boston R. R.,* 24 Barb. 382, N. Y. ; *Fitchburg & W. R. R.* v. *Hanna & al,* 6 Gray 539.

IV.  A railroad can make a valid contract for the transportation of freight beyond the limits of its own road.  *Schroeder* v. *Hudson R. R.*, 5 Duer (N. Y.) 55; *Noyes* v. *Rutland & B. R. R.*, 1 Williams (Vt.) 110; 4 Seld. (N. Y.) 37; 8 Mees. & W. 421; 3 Eng. Law & Eq. 497; 3 Smith (N. Y.) 306; *Thomas* v. *Mills*, 4 E. D. Smith 75; *Carter* v. *Peck*, 4 Sneed (Tenn) 203; 1 E. D. Smith 115; *Waland* v. *Elkins*, 1 Starkie 272.

V.  This defendant received pay for the freight from Nashua to New York, its destination.  *Wilcox* v. *Parmelee*, 3 Sandf. 610; *Mercantile Ins. Co.* v. *Chase*, 1 E. D. Smith 115; *Kirender* v. *Woolcott*, 1 Hill 223.  The case finds there was a connection in business between defendant and the other corporations forming this continuous line.

VI.  Receiving goods as common carriers marked for a particular place, carriers are bound to deliver at that place, even though it be beyond the limit of their route, from the agreement implied from accepting them so marked.  *Ill. Central Railroad* v. *Johnson*, 34 Ill. 389; *Foy* v. *Troy & B. Railroad*, 24 Barb. (N. Y.) 382.

1.  The freight being paid to defendants for entire route is evidence of a contract to carry to consignee.

2.  Receiving the goods marked to a place beyond defendants' line is evidence of a contract to carry to consignee.

3.  The fact that there was a business connection between defendants, Norwich & Worcester and N. & N. Y. Transportation Co., and that the three corporations form a continuous line, the freight paid to defendants the entire distance, and the goods marked for New York, and no objection was made by defendants,—these matters show a special contract to safely carry from Nashua to New York.

4.  If these defendants intended to limit their responsibility as common carriers short of the place to which the goods were directed, they were bound in some way to indicate such intent, especially so, as the freight had been paid, and the goods marked to a place beyond the limit of their road.  Angell C. C., page 93, chapter 4, section 97. In the cases where the liability terminated at the end of the limit of the road, the freight was not paid beyond defendants' road, and there was no continuous line or arrangement to share in the freight, but each road did its business as an independent road, forming no business connection.

VII.  Steamboats are liable for the destruction by fire of goods shipped on board their boats, and there is no established custom which exempts them.  *Patten* v. *Magrath*, Dudley S. C. 159; 26 Maine 181, *Parker* v. *Flagg*.

They are liable for all losses though by inevitable accident, except they arise from the act of God or public enemy.  *Hale* v. *New Jersey Steam Co*, 15 Conn. 539.

The loss resulting from the agency of the propelling powers noted exempt the carriers from liability.  *Ibid.*

Accidental fire, not arising from negligence or carelessness, is not within the exception of a loss caused by the act of God. *Gould* v. *Hill*, 2 Hill 623.

Any act or omission of the carrier, or anything which may befall his vessel and occasion danger to property, is regarded by the law as negligence, unless it be the act of God or the public enemy. 31 Barb. (N. Y.) 38.

Steamboats, as common carriers, are liable as insurers against everything except act of God and public enemies. 28 Barb. 403 (N. Y.) ; 12 Md. 9 ; 32 Penn. S. R. 414 ; 20 Ill. 407 ; 30 Miss. (1 George) 231 ; 30 Penn. 242 ; 19 Geo. 203 ; 4 Zabr. (N. J.) 697.

*G. Y. Sawyer*, for defendants.

I. The defendant company have no power to contract for the transportation of goods beyond the terminus of the railway, such power not being conferred by statute and not being incident to nor necessary for the exercise of the powers which are conferred. So held in Connnecticut. 22 Conn. 1, 502 ; 23 Conn. 457 ; 24 Conn. 468.

In Illinois the power is conferred by statute. Ill. Stats. 222.

In Vermont it has indeed been held that corporations by acquiescing in such extension of their authorized business are estopped to deny their power. 27 Vt. 110. But in other jurisdictions it is held that the doctrine of estoppel is not to be so applied, as the powers of the corporation might thereby be indefinitely enlarged. 8 Wend. 484 ; 8 Gill & J. 319 ; 1 Mary'd. Ch. Dec. 542 ; 22 Conn. 508, 509.

II. But if such contract may be made, here is no evidence on which it may be found. The doctrine of *Muschamp* v. *Lancaster & P. Railway Co.*, 8 Mees. & Wels. 421, and other English cases, that the receipt by a railway company of goods marked for a particular place beyond the line of its railway is evidence of a contract to deliver at that place is repudiated by the current of American authorities. Redfield on Railways, 285, 286 ; Pierce on Railroad Law, 451, 454 ; American Law Register for 1856, note 238, 240. The sound and sensible rule is that each carrier in the absence of any special contract undertakes to transport on his route and to deliver to the next carrier in the usual course of business. 8 Cow. 223 ; 16 Vt. 52 ; 23 Vt. 209. This is precisely his contract. It is said by the court in 16 Vermont 52, that the rule established by the English cases " is neither sound law nor good sense." This view is sustained by the courts of Connecticut and Maryland in the cases cited, by the Supreme Court of Massachusetts in 1 Gray 502, and by the Court of Errors in New York in 6 Hill 158, overruling 25 Wend. 660, cited by the counsel for the plaintiffs. Any rule founded on the theoretical idea that such special contract is to be presumed or is to be considered as proved by a state of facts which does not prove it, and when no such special contract in fact exists, is equally a violation of sound law and good sense. It is matter of notoriety that the convenience of the public having occasion to trans-

port goods by the various railroads forming a continuous route between distant points as well as that of the companies themselves is subserved by an adjustment of the freight with one company for the entire route instead of a separate adjustment with each intermediate company.    To hold that *because* the parties find it for their mutual convenience thus to adjust the freight with the first carrier company in the route, *therefore* that company makes a contract guaranteeing the care and diligence of every other company in the route, when in fact no such contract is made, would be a doctrine of the same character as that of the English cases ; precisely as under the English rule a constructive contract would be made by the court for the parties.    Such rule is not required for the security or protection of parties dealing with the companies nor demanded upon any ground of public policy.    On the other hand it would operate unjustly with the company who might be held constructively to have made such contract as it would subject them to liability as guarantors of all other companies with which they might connect in the line of transportation without just ground for holding them to such liability.

*A. W. Sawyer*, in reply.

I.    The defendants have power to contract for the transportation of goods beyond the terminus of their road, such power being conferred by implication.    In granting the charter, all incidental powers which are necessary to the proper and profitable exercise of those which are specially enumerated, may be presumed to be conferred by implication. It is often of great public convenience, if not of absolute necessity, that several companies should combine their operations, and transport not only passengers but merchandise, by a mutual arrangement, over all their lines, upon one contract for one price.    Chief Justice Waite, of Connecticut, in giving a dissenting opinion in 23 Conn. 457, says, this combination of companies, &c., is founded in *good sense*, and the convenience of mankind ; the power so to contract is incidental to their general powers.    In 23 Conn. 457 and 24 Conn. 468, cases cited by defendants' counsel, the freight was not paid in advance, and the different companies had no connection in business, as in this case.    In one of said cases in Connecticut, Chief J. Waite gave an able dissenting opinion. Another judge also dissented, and still another judge intimates, if the question were up for the first time, he should dissent from the majority of the court.    The case at bar finds that the defendants are accustomed to receive freight at Nashua, destined and directed to New York, &c. It would seem from the case stated, that these defendants hold themselves out to the public, as common carriers to a place beyond the limits of their own road ; they allow their agents to contract for the carrying of merchandise, beyond its limits, taking pay for the whole distance, and subsequently dividing with the other corporations the freight money.    Mr. Justice Redfield, in 27 Vermont 110, says, " if the corporators acquiesce in the extension of the business of the company, even beyond the limits of its charter, and *strangers* are thereby induced to contract upon the faith of the authority of the agents of such com-

pany, the company are not at liberty to repudiate the authority of such agents when their transactions prove disastrous."

In 34 Illinois 389, *Illinois Central Railroad* v. *Johnson*, the court distinctly assert, that without the legislative enactment, " we feel no disposition to deny the power. It may well be deemed an indispensable incident to powers expressly granted.

Upon the point of the legal capacity of these defendants to assume responsibilities for the safe transportation of merchandise beyond the limits of their own road, see Redfield on Railways, 281 to 287 ; 6 Gray 539 ; 11 Cush. 102 ; 7 Allen 329, *Najac* v. *B. & Lowell Railroad;* 47 Maine 573, *Perkins* v. *Portland S. & P. Railroad* ; 3 Eng. L. & E. 497 ; 18 Eng. L. & E. 557 ; 25 Eng. L. & E. 287 ; *Mytton* v. *Midland Railway*, 4 Hurlst. & Norm. 615 ; *Cason* v. *Great Western Railway*, 5 Hurlst. & Norm. 274 ; *Bristol & Exeter Railway* v. *Collins*, 5 Hurlst. & Norm. 969 ; Edwards on Bailments, 504 ; Angell & Ames on Corporations, sections 229, 239.

II.    The plaintiffs contend that here is evidence to find that there was a contract by these defendants to carry these goods from Nashua to New York.    If in the case at bar there had been no express authority, it might have been implied from a mutual arrangement for the carrying business among all the carriers between Nashua and New York.    Where such an arrangement actually exists, there is an implied authority on the part of the agents of each company to make a contract that shall bind them all.

The convenience of trade makes it highly useful to send goods to distant places which can be reached by several connecting but independent lines.    It is important that such business should be accommodated, and it may be by express agreement or established usage.    In the case at bar, it was done by express arrangement, made by the proprietors of this connecting line with each other, and it was not left for the plaintiffs to show the usage.    If each corporation is not held responsible according to its contract, injustice may be done the consignors, and the business of the public will not be properly protected.    The doctrine contended for by the defendants renders it almost impossible to obtain compensation for injuries to goods or their loss, because it is difficult for the owner to prove where it was done, and if he can, he may be obliged to carry on a litigation in a distant State ; it cannot be reasonably expected that a consignor will accompany his freight, watch it, and in case of loss or injury, note the corporation liable.    The cars and merchandise are under the control of the corporation, and it would be hazardous for them to allow persons to travel with the freight to look after the goods sent.    *Sound law and good sense* will not impose such burdens upon consignors.    The fact that there is no evidence in this case, that these defendants intended to limit their liability to the terminus of their road, is in favor of the plaintiffs' theory.

In *Van Santvoord* v. *St. John*, 6 Hill 160, there was no connection between the boats and the canal lines, nor any community of interest between them in the profits of their business ; whereas in 19 Wend.

534, *Weed* v. *S. & S. Railroad*, the two lines were connected to-
gether by an arrangement between themselves; and the agent of the
defendant took the pay in advance for the conveyance the whole dis-
tance.   This last case is analagous to the case at bar, and is cited in 6
Hill 161, with approbation by Walworth, Chancellor.   See also the
dissenting opinion of Porter, Senator, in 6 Hill 171.

PERLEY, C. J.   According to the agreed case the three corporations,
the Worcester & Nashua Railroad, the Norwich & Worcester Railroad,
and the Norwich & New York Transportation Company, were engaged
as common carriers in the business of transporting goods between Nash-
ua and New York in a continuous line under an agreement by which
they divided the price paid for transportation through in proportions
fixed by the agreement.   The agreement is not before us; but from the
general statement of it in the case it must be inferred that the parties to
it were mutually bound to transport goods on their connected line ac-
cording to the direction given by the owner, when they were received
for transportation in the usual course of the business by any one of the
parties.   In this case it would have been a violation of the agreement
among the parties to the continuous line, if either the Norwich & Wor-
cester Railroad or the Transportation Company had refused to receive
and transport the goods towards their destination in the usual course of
the business as they were marked and directed when they were received
by the defendants.
The contract between the plaintiffs and defendants must be implied
from the facts stated in the agreed case.   There was no special agree-
ment, written or oral, that the goods should be carried to New York,
nor that the responsibility of the defendants should end on delivery to
the Norwich & Worcester Railroad.   The general question is whether
the defendants undertook for the transportation of the goods through to
New York, or only agreed to carry and deliver, or tender, them to the
Norwich & Worcester Railroad.
Had the defendants corporate authority to contract for the transpor-
tation of the goods beyond their own line?   We have no hesitation in
holding that railroads may contract to carry goods and passengers be-
yond their own lines.   They could not answer the main objects of their
incorporation without the exercise of this power.   They are laid out
and established with reference to connections in business with other ex-
tended lines of transportation, and the power to contract for transporta-
tion over the connected lines is implied in the general grant of corpor-
ate authority.   On this point the authorities are nearly unanimous.   It
has been held otherwise in Connecticut by the opinion of three Judges
against two.   *Hood* v. *N. Y. & N. H. Railroad*, 22 Conn. 1; *El-
more* v. *The Naugatuck Railroad*, 23 Conn. 457; *The Naugatuck
Railroad* v. *The Button Company*, 24 Conn. 468.   But in a later
case, *Converse* v. *The Norwich & N. Y. Transportation Comp my*,
33 Conn. 166, the court in that State have shown some disposition to
recede from the doctrine of their earlier cases.   No other authorities
are cited by the defendants to this point, and I have found no others

that sustain their view of this question.   The authorities the other way are numerous and decisive ; *Muschamp* v. *The Lancaster & Preston Railway*, 8 M. & W. 421 ; *Weed* v. *The S. & S. Railroad*, 19 Wend. 524 ; *The F. & M. Bank* v. *The Ch. Transportation Company*, 23 Vermont 186 ; *McCluer* v. *M. & L. Railroad*, 13 Gray 124 ; *Rogers* v. *R. & B. Railroad*, 27 Vermont 110 ; *Wilcox* v. *Parmelee*, 3 Sandf. 610 ; *Perkins* v. *The P. S. & P. Railroad*, 47 Maine 573 ; and railroads may contract for transportation beyond the limits of the States in which they are established ; *McCluer* v. *The M. & L. Railroad*, 13 Gray 124 ; *Burtis* v. *B. & S. L. Railroad*, 24 New York 369 ; and when a railroad makes · a contract for transportation beyond its own line it will be presumed that it had authority to do it.   *McCluer* v. *M. & L. Railroad, qua supra.*

In the agreed case it is said the goods were received to be *forwarded* &c., and from this phrase an argument is drawn that the agreement of the defendants was to forward to the next party in the line and not to carry through to New York.   But here was no express agreement in any particular terms, and we are not called on to interpret the language used in any contract.   The nature of the undertaking must be inferred from the facts stated in the agreed case, and cannot be determined by the phrase used in stating them.   Even in a written contract, where the term *forwarded* is used, if the thing to be done belongs to the business of a carrier, he will be charged as such.   In *Wilcox* v. *Parmelee*, 3 Sandf. 610, the court say :   " The criticism of the defendant on the word *forwarded* used in the contract is not just.   It applies to the whole distance, as well to those portions of the route where other parties were owners of the vessels, as to that portion where he employed his own means of transportation.   He was to forward the goods from New York to Fairport, not to Buffalo, which he now says was the terminus of his own immediate route.   The words used by him can only mean that he was to carry or transport the goods, and whether in his own vessels or in those of others was perfectly immaterial to the plaintiff."   In *Schroeder* v. *The Hudson River Railroad*, 5 Duer 55, the defendants gave a receipt for goods " to be *forwarded* per Hudson River Freight Train to Chicago " ; and under this receipt it was held that the defendants were bound to *carry* the goods to Chicago. So in the recent case of *Buckland* v. *The Adams Express Company*, 97 Mass. 124, the defendants were charged as common carriers though they described themselves in the contract under which they received the goods, as " Express Forwarders."   In the present case the undertaking of the defendants must be implied from the facts stated in the agreed case, and the particular language used in stating them is of no materiality.

Since the introduction of steam as the means of transportation by land and water the general question raised in this case has been much considered in different jurisdictions, and there is no little confusion and contradiction of authority respecting the rule which shall govern the rights and liabilities of the parties, where goods are put in the course of transportation to distant places through connected lines associated in the

business of common carriers.    Where such lines are engaged in carrying passengers and their luggage the several parties to the continuous line incur, it would seem, the same liabilities for damage and loss of the luggage as in cases where they carry goods only.   *Darling* v. *The Boston & Worcester Railroad*, 11 Allen 295 ;  *Quimby* v. *Vanderbilt*,  17  New York  312 ;  *Weed* v. *The Railroad*, 19 Wend. 534 ; *The Ill. Central Railroad* v. *Copeland*, 24 Ill. 332 ;  *Ill. Central Railroad* v. *Johnson*, 34 Ill. 382.

In England and in several of the United States, it has been held that when a railroad or other  common carrier receives goods marked or otherwise directed for a place beyond the carrier's own line, this alone is *prima facie* evidence of a contract to carry the goods to their final destination, though the freight money for transportation through is not paid to the carrier that receives the goods, and though he is not shown to have any connection in business with other parties beyond his own line.    *Muschamp* v. *The Lancaster & Preston Railway*, 8 M. & W. 421 ;  *Watson* v. *The Ambergate, Nottingham & Boston Railway*, 3 Law & Equity, 497 ;  *Collins* v. *The Bristol & Exeter Railway*, 11 Exchequer 790, S.C., 7 House of Lords Cases 194 ;  *Coxon* v. *The Great Western Railway*, 5 Hurlstone & M. 274.    These and several other cases show that in England, after the fullest discussion in all the courts, the rule is firmly established that a  carrier who receives goods marked for a place beyond his own line is *prima facie* bound to carry them as directed to their final destination, and it is  there held that the contract in such case is  entire, and with the first carrier alone ; that until some connection in the business, which has the general nature, if not the technical character, of a partnership, appears between him and the subsequent carriers, no action can be maintained against them by the owner, though the goods were lost or damaged on their part of the route.

I have not met with an American case, in which the rule has been pressed to the extent of holding that the owner cannot come on any carrier, by whose default the  loss or damage actually happened.    There are, however, numerous authorities in the United States for the general rule of. *Muschamp* v. *The Railway*, that the receipt of goods marked for a place beyond the line of the carrier who  receives them, implies a contract to carry them  to their final destination, though no connection in business is  shown with other carriers beyond, and though the price for transportation through is not paid in advance.

In *Foy* v. *The Troy & Boston Railroad*, 24 Barb. 382, the doctrine of the case is stated in the head note to be that " where a railroad company receives for transportation property addressed to a person at a point beyond the terminus of the road, he will be understood, in the absence of any proof to the contrary, to have agreed to deliver the property in the same  order and condition in which  it was received, to the consignee."    The court say, " it was no part of the plaintiff's business to inquire 'how many different corporations made up the entire line of road between Troy and Burlington, or, having ascertained this, to determine at  his peril, which of said companies had been guilty of the negligence which resulted in the injury to his wagon."    In *Schroeder*

v. *The Hudson River Railroad* 5 Duer 55, the agent of the defendants gave the following receipt at New York : " Received of Schroeder six boxes—to be forwarded per Hudson River Railroad freight train to Chicago, Illinois ;" and it was held that the defendants under this receipt were bound to transport the goods to Chicago. No connection in business with other carriers was relied on.    In *Kyle* v. *The Laurens Railroad,* 10 Rich. (Law) 282, the rule of *Muschamp* v. *The Railway* was approved.   O'Niel, J., says : " The case of *Muschamp* v. *The Lancaster & Preston Junction Railway* states, I think, the true rule."    The rule of *Muschamp* v. *The Railway* was approved and adopted in the *Central Railroad* v. *Copeland,* 24 Illinois 332, in which it was held that " a railroad corporation selling tickets through over its own and other roads is liable for the safety of passengers and their baggage to the point of destination."    The case was put on the same ground as when goods are received marked for a place beyond the line of the carrier that receives them.   The court say : "We are inclined to yield to the force of the reasoning of the English courts, on principles of public convenience, if no other, and to hold when a carrier receives goods to carry marked for a particular place, he is bound to carry and deliver at that place.    By accepting the goods so marked he impliedly agrees so to do, and he ought to be answerable for that loss."    In the later case of *The Central Railroad* v. *Johnson,* 33 Illinois 382, it was decided in the same State that " when a carrier receives goods to carry marked for a particular place, he is bound under an implied agreement from the mark or direction to carry to and deliver at that place, though it be a place beyond his own line of carriage."    In *The Detroit & Milwaukee Railroad* v. *The F. & M. Bank,* 20 Wis. 122, the railroad gave a receipt for the goods directed to New York, but the receipt provided that the railroad should not be liable beyond their own road, and it was held that by an express agreement a carrier might limit his liability to his own road, when he receives goods marked for a place beyond it.    The road was in that case discharged upon the ground of an express agreement that it should not be liable beyond its own line, from which the inference is plain that, in the absence of an express agreement controlling the contract otherwise implied from the receipt of the goods marked for a place beyond its line, the road will be liable for a loss happening beyond.   In *Angle* v. *The Mississippi & Missouri Railroad,* 9 Iowa 487, it was decided that " when a common carrier receives goods marked for a particular place beyond the *terminus* of his route, unaccompanied by any direction as to their transportation and delivery except such as may be inferred from the marks, he is *prima facie* bound to carry and deliver them according to the marks."

*St. John* v. *Van Santvoord,* 25 Wend. 660, is a strong authority for the rule that when goods are received by a carrier marked for a place beyond his line, he is bound to carry them to their final destination, if there is nothing to control the contract implied by the receipt of the goods so marked.   Nelson, C. J., delivering the opinion of the court says : " It appears to me such a contract is fairly to be inferred from the receipt of the captain in the absence of any explanation.    The box

was directed to J. Petrie, Little Falls, Herkimer county, indicating
plainly to whom the plaintiffs were desirous of sending it, and was de-
livered on board for the express purpose of transhipment to him ; and
without any qualification or explanation the agent received the article
and gave his receipt, in effect saying to the plaintiff, I will take and de-
liver it at the place of destination according to the direction.  So the
plaintiffs must have understood the contract.  It is the plain interpreta-
tion of the transaction.  If the defendants had intended to limit their
duty as common carriers short of the place of destination, they should
in some way have indicated to the plaintiff this intent."  The judgment
of the Supreme Court in this case was reversed by the Senate, 6
Hill 157, upon the ground that the court should have received evidence
of a custom controlling the general effect of the receipt of the goods
marked for the place of destination, though the custom was not known
to the plaintiff ; leaving the doctrine untouched that the receipt of the
goods so marked in the absence of evidence to explain and control the
transaction would imply an agreement to carry to the place for which
they were marked.

The American authorities above cited sustain the doctrine of *Mus-
champ* v. *The Railway*, that when a carrier receives goods marked for
a place beyond his own line, he is, *prima facie* and in the absence of
other evidence, bound by an implied contract to carry the goods to the
place for which they are marked, though he has no connection in business
beyond his own line and though he does not receive pay for transporta-
tion through.

There is another class of American cases which hold that the mere
receipt of goods marked for transportation beyond the line of the party
that receives them is not evidence of a contract to carry beyond his
own line, if he has no connection in business with carriers beyond ; but
that, if several carriers associate in a continuous line, carry goods for
one price through, and divide the freight money among them in an
agreed ratio, though they may not be technically partners, but only
*quasi* partners, yet as to third persons who entrust goods to them for
transportation they are jointly liable for a loss that happens in any
part of the continuous line, though the freight money is not paid to the
first carrier on delivery of the goods to him.

In *Champion* v. *Bostwick*, 11 Wend. 571, S. C., 18 Wend. 174,
several proprietors of different sections in a connected line of stage
coaches divided the receipts of the whole route in proportion to the miles
run by each ; and it was held that they were jointly liable as partners
for an injury to a third person, not a passenger, caused by the negli-
gence of one of them.  It is to be observed that in this case the receipts
of the way as well as the through travel were brought into the ac-
count ; and on this, a distinction has been taken between that case and
one where the receipts of the through travel only are divided ; and for
that reason it has been said that in a case like the present there is no
partnership and no joint liability.  But as to parties, who deal with the
through line, it is of no consequence how the other business is managed,
or whether any other business is done by the associated carriers.  At

most the distinction is merely technical and has no substance.   Nor am
I acquainted with any legal principle to prevent  one  engaged in a gen-
eral business from having a partner  in  one  distinct part of it, like the
through  business  in  this  case, without bringing all his business of the
same kind into the partnership account.   I take it to be  no  uncommon
thing for a trader to have a partner in  his  business done at one place,
who has no concern in his business of the same kind transacted at other
places;  that attorneys form partnerships limited to certain parts of their
business, and merchants, in the voyages, or·in  a  single voyage, of one
ship.

 *Hart* v.  *The Rensselaer & Saratoga Railroad* is to the point that
" where three separate railroad companies owning distinct portions of a
continuous railroad route between two termini run  their  cars over the
whole road, employing the same agents to sell passenger tickets, and
receive luggage to  be  carried over  the  entire road, an  action may
be maintained against any one of them for loss of  luggage  received at
one terminus to be carried over the whole road."   Smith, J. delivering
the opinion of the court in  *McDonald v. The  Western Railroad*, 34
New York 501, 502, says.   " We may judicially take notice of the fact
that the vast business of inland transportation of  goods  is carried on
mainly upon routes  formed  by  successive lines belonging to different
owners, each of  whom  carries the goods over his own  line  and delivers
them to the next.   Many of  these  routes extend  over  thousands of
miles.   Their proprietors unite and receive goods for transportation *up-
on the promise express or implied* that they shall be  carried safely to
the place of delivery.   The owner has lost sight of his  goods when he
delivers them to  the  first carrier and  has  no means of learning their
whereabouts till he  or the consignee is informed of their arrival at the
place of destination."

 In  *Wibert* v.  *The  Erie Railroad*, 12 New York 256, it was said
that " where a carrier is in the habit of receiving and forwarding goods
directed to any particular place, an agreement on his part to  take them
there has  been presumed ;  but where these operations are  entirely dis-
connected, there is no partnership.   In  *Bradford* v.  *The  Railroad
Company*, 7 Rich. (L.) 201, it was held that " an advertisement of a
through line and the course of the business is evidence to charge all the
roads engaged in the continuous line of transportation  as  jointly liable
for carriage through  the  whole route."   Redfield, C. J., in delivering
the opinion of the court in  *The F. M. Bank* v.  *The  Transportation
Company*, 23 Vermont 131, speaking of  *Weed* v.  *The  S. & S. Rail-
road*, 19 Wend. 534, says " that  case  is  readily  reconciled with the
general rule that such carrier is only bound to the end of his own route,
by the consideration that in this case there was  a  *kind of partnership
connection* between the first company and the  other  companies consti-
tuting the entire route, and also that the first carrier took  pay and gave
a *ticket* through, which is  most  relied on  by the court ;  and in such
cases where the first company gives a ticket and takes pay through it
may be fairly considered equivalent to an undertaking to carry through-
out the entire route."   In  a  note to this case  by Redfield, C. J., he

says " in that case ( *Weed* v. *The Railroad*) the court seem to put the case more upon the fact of taking fare and giving a ticket through, which in practice is seldom or never done except where there is a *quasi partnership* throughout the route." This would seem to be a strong authority that where there is a connected line of carriers, and a *quasi*, though it may not be technical and legal partnership, they are liable jointly for carriage through the whole connected route.

By the statute of New York, enacted in 1847, " whenever two or more railroads are connected together any company owning either of said roads receiving freight to be transported to any place in the line of either of said roads shall be liable as common carriers for the delivery of such freight at such place." This statute has received a liberal construction and been held to make a railroad in New York liable for a loss on a road in the connected line beyond the limits of the State ; *Burtis* v. *The Buffalo & State Line Railroad,* 24 New York 269 ; but not to discharge an intermediate carrier for loss caused by his own fault. *Smith v. The N. Y. Central Railroad,* 43 Barb. 225.

In *The Cincinnati H. & D. Railroad* v. *Speat,* 2 Duval 4, it was decided that " where several parties are associated for the transportation of freight from Louisville to New York, executing through bills of lading and charging through freight, they will be chargeable as common carriers between those points ; and in such cases public justice and commercial policy require a stringent construction against any intermediate irresponsibility as common carriers." Two points were decided in this case : that the defendants were liable as common carriers for transportation through to New York ; and that on the facts of the case they held the goods as common carriers and not as warehouse men. The court say : "The facts conduce to prove that the appellants, associated as they were with steamboats and other carriers from Louisville to Cincinnati as joint transporters between those points, and jointly charging through freight and giving through receipts, were in the popular and technical import common carriers to the whole extent between those termini ; and in such cases, where associated companies are engaged in a common undertaking for transportation on a long line, public justice and commercial policy require a stringent construction against any intermediate irresponsibility as common carriers." This reasoning applies with full force to the present case.

In 2 Redfield on Railways 104, the learned author sums up the result of the American cases on this particular point as follows : " The American cases upon the subject, with rare exceptions, recognize the right of a railroad company to enter into special contracts to carry goods beyond the line of their road ; and *where different roads are united in one continuous route* such an undertaking, when goods are received and booked for any part of the line, is almost a matter of course." In the present case the defendants were united in a continuous line to New York ; the goods were received *marked,* which must be equivalent to *booked,* for New York ; and the case would seem to fall clearly within the rule laid down in Redfield as the result of the American authorities.

There is still another class of cases, in which it is held that the fact

of a carrier's receiving pay for transportation to a place beyond his own line implies a contract to carry to that place.   In the case of *Hyde* v. *The Trent & Mersey Navigation Company*, 5 T. R. 389, decided in 1793, the marginal note is as follows :   " Common carriers from A to B, charge and receive for cartage to the consignee's house at B from a warehouse there, where they usually unloaded, but which did not belong to them ; they must answer for the goods if destroyed in the warehouse by an accidental fire, although they allow all the profits of the cartage to another person, and that circumstance were known to the consignee."   The four judges delivered their opinions seriatim and all agreed that the charge for cartage to the house of the consignee " put the case out of all doubt;" and bound the carriers who made the charge, to carry the goods to their final destination.   In answer to the argument that the carriers acted as agents of the owner in forwarding the goods beyond their own line, Mr. Justice Buller said : " According to the defendants' own argument great inconvenience would result · to the public from adopting the other rule.   According to their argument there must be two contracts, where goods are sent by coach or wagon.   But I think the same argument tends to establish the necessity of three ; one with the carrier, another with the inn-keeper, and a third with the porter.   But in fact there is but one contract ; there is nothing like any contract or communication between any other person than the owner of the goods and the carrier.   But I rely on the charge which the defendants compelled the plaintiff to pay before they would engage to deliver the goods.   The different proprietors may divide the profits among themselves in any way they choose, but they cannot exonerate themselves from their liability to the owner of the goods."   This case, coming before the agitation of these questions on the introduction of steam as a motive power, and decided on the general principle applicable to the liability of carriers at common law, is certainly of very great weight. It decides that when a carrier receives goods to be transported beyond his own line and takes pay for carrying them to their final destination, he agrees to do what he has been paid for doing ; and it repudiates the fanciful theory of an agency for the owner to forward the goods and in his behalf procure them to be carried by others.

In *Weed* v. *The Saratoga & Schenectady Railroad*, 19 Wend. 534, the plaintiff's agent took passage at Saratoga in the Saratoga & Schenectady Railroad for Albany and paid his fare to Albany.   The route to Albany consisted of the defendants' and the Mohawk & Hudson River Railroad.   When the agent arrived at Albany his trunk containing money of the plaintiff was missing, and this action was brought to recover for the loss.   One ground taken for the defendants was that there was no evidence the trunk was lost on their road.   There was no evidence of a contract to carry to Albany except such as was implied from the fact that the two roads made a continuous line to Albany, and the defendants took the trunk for carriage to Albany and received the pay for carrying through.   It was held that the payment and receipt of fare through bound the defendants as carriers over the other road through the whole continuous route.

*Wilcox* v. *Parmelee*, 3 Sandf. 610, is an authority to the same point, that receiving pay for transportation to a place beyond the line of the carrier who receives it, implies a contract to carry to that place. The court say : " Besides, there is a fixed sum which covers the whole charge ; and it would be absurd to suppose that the defendant was to receive the whole sum for merely forwarding, that is, placing the goods on the vessels of some other party to be carried to their place of destination."

*Van Santvoord* v. *St. John*, 6 Hill 157, cited for the defendants recognizes the doctrine of *Weed* v. *The Railroad*. In his opinion for reversing the judgment of the supreme court the Chancellor says : " In the case of *Weed* v. *The Railroad* the two lines were connected together by an arrangement between themselves, and the agent of the defendant took the pay in advance for the conveyance of the plaintiff and his baggage the whole distance. Or, if no actual connection between the two lines was proved, it at least appeared that the defendant permitted its agent to hold it out as a carrier of passengers and their baggage for the whole distance *by taking pay therefor*." It thus appears that in *Van Santvoord* v. *St. John*, as in *Hyde* v. *The Navigation Company*, taking pay for carriage to a place beyond the line of the party that takes it is regarded as decisive of an undertaking to carry to that place. *Quimby* v. *Vanderbilt*, 17 New York 315, is to the same point, that receiving pay for carriage through a continuous line imports a contract to carry through ; and in *Burtis* v. *The Buffalo & State Line Railroad*, 24 New York 269, 278, Sutherland J, says : " It would appear to be settled by both the American and English cases that when from usage in the particular business or *by receiving pay to the place* to which the goods are addressed, beyond the railway company's road, or from any other circumstance, it is to be presumed that the undertaking of the railway was to deliver at such place, they are responsible for the delivery of the goods at such place, and are liable if the goods are lost after leaving their road."

In *Choteaux* v. *Leach*, 18 Penn. St. Rep. 224, furs were shipped at Cincinnati for New York. The defendants admitted that they were carriers on the canals and railroads of Pennsylvania, but denied that they were on the river Ohio. The furs were lost in a steamboat on that river. The court (Black, C. J.,) say : " They, the defendants, received the full freight from Cincinnati to New York ; and this is wholly inconsistent with the notion that they were agents for the shipment of the furs, and not carriers from Cincinnati to Pittsburg, as well as on other parts of the route." To the same point is *The Baltimore & Philadelphia Steam Boat Company* v. *Brown*, 54 Penn. 77, which cites and approves *The Illinois Central Railroad* v. *Copeland*, 24 Illinois 338 ; *The Illinois Central Railroad* v. *Johnson*, 34 Illinois 382, and *The Railroad* v. *Schwartzenburg*, 9 Wright 208. So in *Candee* v. *The Pennsylvania Railroad*, 21 Wis. 582, where a railroad sells a through passenger ticket by a specified route to some point out of the State over lines belonging to other companies, it seems the understanding of the first company is to transport the passenger and his baggage

to such place of destination. *Cary* v. *The Cleveland & Toledo R. R.*, 29 Barb. 36, is to the same effect, and also *The Illinois Central R. R.* v. *Copeland*, 24 Illinois 332, in which it was held that a railroad selling tickets through over its own and other roads is liable for the safety of passengers and their baggage to the point of destination, *Wheeler* v. *The Railroad*, 31 Cal. 52, cites and apparently approves the doctrine as laid down on this point in 2 Redfield on Railways, 109. In *Carter* v. *Peck*, 4 Sneed, (Tenn.) 203, the defendants received fare and gave a ticket to a point beyond their own line ; it was held that they were liable for a detention beyond their own line. Harris J., delivering the opinion of the court, says : " When the defendants received the plaintiff's money and gave him a through ticket, they thereby became bound for his transportation over the entire line. The arrangement between the defendants and the proprietors of other portions of the line was a matter with which the plaintiff had nothing to do. He was no party to' that arrangement, nor was he bound to look to any person for the performance of the defendant's undertaking to any person but themselves."

Redfield, in Red. on Railways 109, sums up the result of the authorities on this point as follows : " It has generally been considered, both in this country and in the English courts, that receiving goods destined beyond the terminus of the particular company and giving a check or ticket through does import an undertaking to carry through, and that this contract is binding on the company."

Then, again, there are American cases which maintain the doctrine that, though carriers are associated in a continuous line and one of them, on receiving goods marked for transportation through, takes pay for transportation through, which by agreement of the parties to the continuous line is divided among them in a fixed proportion, yet in the absence of a positive agreement, each carrier is liable for loss on his own line, and not for a loss on any other part of the connected line.

This appears to be the settled rule in Connecticut. In *Hood* v. *The New York & New Haven Railroad*, 22 Conn. 1, the defendants' road was connected with a line of stage coaches which runs from their terminus to Coleville ; and they advertised that passengers by their line went by stage from Farmington to Coleville. The plaintiff bought a ticket of the defendants at New Haven for Coleville. The conductor on the said road took up the plaintiff's ticket and gave him one for the stage. The plaintiff was injured on the stage route. The whole fare through was paid to the defendants, and they accounted on settlement with the proprietors of the stage line, and this was according to the custom of the business. There was no other contract between the stage company and the railroad. It was held that there was no contract by the defendants to carry the plaintiff on the stage route. The decision would seem to have been put mainly on the ground that the defendants had no corporate authority to contract for carriage beyond their own line. In *Elmore* v. *Naugatuck Railroad*, 23 Conn. 457, it was decided that neither the receiving of goods directed to a point beyond the line of the road, nor an advertisement of the general facilities of trans-

portation through the route is evidence of a special contract to carry goods to the place to which they were directed. *The Naugatuck Railroad* v. *The Button Company*, 24 Conn. 468, is to the same effect; and in the later case of *Converse* v. *The Norwich & Worcester Transportation Company*, 33 Conn. 166, the court consider the question as settled in Connecticut.

In Maine a single case is cited by the defendants, *Perkins* v. *The P. S. & P. Railroad*, 47 Maine 573, and I have found no other in that State bearing on the present question; the head note of which is as follows: "A railroad company may be bound by special contract, (but not otherwise), to transport persons or property beyond the line of their own road." It is to be observed that in this case of *Perkins* v. *The Railroad*, the plaintiff had judgment, on the ground of a special contract; from which the negative inference is drawn that the plaintiff could not recover otherwise than by a special contract. This cannot be regarded as quite equivalent to a direct decision on the point; for if the point was raised in the case it certainly did not require the court to determine whether a special contract was necessary to charge the defendants, and besides there is reason to think that the term "express contract" could hardly have been used in its strict sense to signify a contract in the form of a direct promise or undertaking in language, oral or written, proper to show a positive agreement; since the judge, who delivered the opinion of the court speaks of a case where the carriers would be liable on the ground that they "held themselves out as common carriers to that place;" in which case, as I understand it, the contract would not be express, in the strict or usual sense of the term, but implied from the conduct of the party. And the same learned judge also says: "It is of great public convenience, if not absolute necessity, that several companies should combine their operations, and thus transport passengers and merchandise by a mutual arrangement over all their lines, upon one contract, for one price. In such cases each is held liable for the whole distance." Instances are to be met with in other books of a similar latitude in the use of the term *special contract*, as in 2 Red. on Railways 104, where the term *special contract* is used, but the example given is of a contract implied from certain facts. For these reasons we are not inclined to regard *Perkins* v. *The Railroad*, as a direct and final decision by the courts in Maine of the question raised in the present case.

In *Nutting* v. *The Connecticut River Railroad*, 1 Gray 502, the supreme court of Massachusetts decided that "a railroad corporation receiving goods for transportation to a place beyond the line of their road on another railroad which connects with theirs, but with the proprietors of which they have no connection in business, and taking pay for transportation over their own road only, are not liable, in the absence of any special contract, for loss of the goods after their delivery to the proprietors of the other road." This could hardly be regarded as an authority for the defendants in the present case; and I find nothing in the opinion of the court, which carries the doctrine of the case beyond the statement of the head note. But in later cases the rule has

been established in Massachusetts that a carrier is not bound for the transportation of goods beyond his own line in the absence of a positive agreement to that effect. In *Darling* v. *The Boston & Worcester Railroad*, 11 Allen 295, it was decided that if an arrangement is made between several connecting railroad companies, by which goods to be carried over the whole route shall be delivered by each to the next succeeding company, and each company receiving them shall pay to its predecessor the amount already due for carriage, and the last one collect the whole from the consignee, a reception of such goods by the last company, and payment by it of the charges of its predecessors will not render it liable for an injury done to the goods before it received them." From this case the general rule has been deduced in Massachusetts that a carrier is not liable for loss beyond his own line without a *positive agreement* to be so liable; though some of the discussion in *Darling* v. *The Railroad* seems hardly consistent with such a rule, for the learned judge who delivered the opinion says " the usage as to the manner of doing the business enters into the contract as part of it, in the absence of an express contract. But the convenience of commerce makes it highly useful to send goods to distant places which can be reached only by independent lines of transportation. It is important that this business should be accommodated; and this may be done by express agreement or *established usage*. It is frequently done in this country by arrangements made by the proprietors of connecting lines with each other; and this is much better than to leave any important matter of this kind to be settled by usage. When such arrangements are made, the liability of each line is to be determined by a fair construction of their terms." That is to say, usage enters into the contract on which the goods are carried for the owner; but when the business is done on the connected line by an agreement among the parties to it, the liability of the different parties to the owner for the transportation of his goods is to be determined by a fair construction of the terms of the agreement among the parties to the connecting line; and the contract on which the goods are carried is inferred from usage, or from the arrangements among the parties to the connected line, and in such case does not depend on any positive agreement between the owner of the goods and any one of the carriers.

We have been furnished with a manuscript copy of the opinion in *Goss* v. *The New York, Providence & Boston Railroad*, decided in Suffolk, March, 1868, since reported, (99 Mass. 220,) in which on facts that we cannot distinguish from the present, the court held that the point was settled by the prior decisions in Massachusetts, especially by the case of *Darling* v. *The Railroad*, and declined to discuss the general question further. And in the case of *Burroughs* v. *The Norwich & Worcester Railroad*, decided in September, 1868, we have also been furnished with the opinion of the court holding the law to be well settled in Massachusetts that a corporation established for the transportation of goods over a line between certain points and receiving goods directed to a more distant point is not responsible beyond the end of its own line, unless it makes a positive agreement extending its liability.

And this rule, if a newspaper report can be trusted, was lately applied in *Pendergast* v. *The Adams Express Company*, by the same court to the case of an express company that gives a receipt for money directed to a place beyond the line of the company that gives the receipt.

It has been said that the English rule on this subject has not been generally adopted in this country. A review, however, of the American cases shows but too plainly, that if our courts have differed from the English, they are far from agreeing among themselves in any principle or doctrine that can be called the *American rule*. There is not only much confusion, but no little conflict in the American authorities. A large proportion of them are not directly in point for the present case, which must be decided on the facts found by agreement of the parties.

The following are the facts and circumstances from which the contract between these parties must be inferred :

The three corporations were engaged as common carriers in the transportation of goods in a connected line between Nashua and New York, under an agreement among the parties to the connected line.

In the present instance, and generally under the agreement, one price was paid for transportation through.

The freight money was divided among the parties to the connected line in proportions fixed by their agreement.

The goods were received by the defendants for transportation on the connected line marked for New York.

The legal inference from the general statement of the agreement is that the parties to the continuous line were bound by their mutual contract to take from each other and carry through goods so marked, that might be received by any one of them.

The price for transportation to New York was paid to the defendants, when they received the goods.

The American authorities are comparatively few, which hold that when all these circumstances concur, the carrier who receives the goods is not bound, by an implied agreement, to carry them, or see that they are carried, over the connected line to their final destination. I do not find that the decisions in any of the States sustain this defence, except in Connecticut, Maine and Massachusetts.

With regard to the cases in Connecticut, it cannot imply any want of the respect due to the courts of that State, if I say that for two reasons their cases on this point are not entitled to all the deference that is paid to their decisions on other subjects. In the first place, it is held there that railroad corporations have no corporate authority to contract for the transportation of goods or passengers beyond their own lines ; a doctrine rejected every where else. If it were admitted that railroads had the power to make such contracts, it does not appear that the courts in Connecticut would have decided that the plaintiff in a case like this would not be entitled to recover. Indeed it would seem from the opinion of the court as delivered by Ellsworth J, in *Elmore* v. *The Naugatuck Railroad*, 23 Conn. 457, that in Connecticut these defendants would be held liable if their power to contract were conceded. He says " no money was paid, or agreed to be paid, for conveying the

leather to any specific place.   There was no evidence or claim that there
was any connection between the defendants and the steamer, except in
the customary way of forwarding freight they delivered the goods to
each other from time to time as they were marked for transportation,
no matter to what place, whether to New York, California, Europe or
Asia.   It is obvious that where the different carriers throughout the
route are connected in business by some joint undertaking or partner-
ship, there can be no difficulty in case of a loss which happens on any
part of the line; but the question arises, where this is not the case,
what is the law then?"   From this it seems to me that we are war-
ranted in supposing, if the defendants had power to contract and the
facts had been such as are found in the present case, the court in Con-
necticut would have no difficulty in charging the defendants for a loss
happening in any part of the line.   Then again these decisions in Con-
necticut were by three judges against two; Waite, then Chief Justice,
and Hinman, who has since filled that place.   The reasons for holding
the defendants liable in *Elmore* v. *The Railroad* are very ably and
forcibly stated by Waite, C. J, in his dissenting opinion.   Such dissent,
it is evident, leaves the authority of the cases so much reduced that they
cannot be entitled to great weight out of the jurisdiction in which they
were decided.

The single case of *Perkins* v. *The P. S. & P. Railroad*, for rea-
sons before suggested, we cannot consider as a final settlement of the
question in Maine.

But in Massachusetts the court in a series of decisions have es-
tablished the rule that a carrier, though associated with others in a con-
nected line of transportation is not liable for a loss happening beyond
his own line without a positive agreement to that effect; and this rule
is applied to the baggage of passengers, and the undertaking of express
companies that receive goods for transportation beyond their own lines.
The fact that notwithstanding the earlier decisions, suits have continued
to be brought in that Commonwealth against parties that have received
goods to be transported on continuous lines for losses happening beyond
their own lines, might seem to suggest a suspicion that the profession
and the public had not readily acquiesced in the rule as there laid down;
but the court have adhered firmly to the rule, and in some of the later
cases have apparently declined to enter on the discussion of the question,
treating it as finally settled; and we must therefore consider the high
authority of that court as against the right of the plaintiffs to recover
in this action.   So far, however, as that court may be understood to have
established the rule that to bind a railroad for transportation beyond its
own line there must be an express and positive agreement between the
railroad and the owner of the goods, and that such an undertaking is
not to be implied from facts such as are found in this case, the cur-
rent of American authority, to say nothing of the English, appears to
be strong the other way.   Excepting the cases in Connecticut and Maine,
which, when examined, do not, I think, give the Massachusetts doctrine
any very strong support, the authorities in other States, though they
differ much in other particulars, generally agree in this, that where, as

in the present case, there is a continuous line of different carriers unit-
ed by an agreement under which they carry goods through the connect-
ed line for one price, which they divide among themselves in propor-
tions fixed in their agreement, if one of the parties receiving goods to
be transported on the continuous line, marked for any place in it, and
on receiving the goods takes pay for transporting them to that place,
the party so receiving the goods and the pay for transportation, is *pri-
ma facie* bound by an implied agreement to carry the goods, or see
that they are carried to the place for which they are marked, and is
liable for a loss happening on any part of the connected line.

If the case were to be considered on authority only, we should feel
bound to decide for the plaintiffs, inasmuch as we find the weight of
authority to preponderate heavily in their favor; and taking general
principles and reasons of convenience and public policy for our guide,
we are led to the same conclusion.

In the view which the plaintiffs ask us to take of this case, when the
goods were received by the defendants, marked for transportation to
New York, and the price paid to the defendants for transportation through
on the continuous line, the plaintiffs made one contract with the de-
fendants, by which the defendants agreed, either as joint carriers with the
other associated parties, or as undertaking for them to carry the goods
through for the price paid, as goods were carried in the usual course of
the business on that line. In that view the plaintiffs would have noth-
ing further to do in the matter. Everything else was provided for by
the agreement among the associated carriers; for by their agreement the
defendants were bound to transport and the successive carriers would be
bound to take and carry the goods from each other to their final desti-
nation. The price through was paid, and belonged to the different
carriers in proportions fixed by their agreement, and this theory would
agree exactly with the facts; for the plaintiffs in fact made but one
agreement with one party to have the goods carried for one price to New
York. No further stipulation or direction on the part of the plaintiffs
was necessary, and none was ever in fact given by owners of goods who
put them in the course of transportation, as these were put, in the con-
tinuous line.

According to the defendants' theory of the case, when the plaintiffs
delivered the goods marked for New York, and the defendants received
them and took pay for transportation through, no contract was made
with any party to carry the goods through; but the contract then made
by the defendants was to carry the goods to the next carriers on the con-
nected line with the surplus money, and as agents of the plaintiffs make
a contract if they could with the next carriers to take the goods and the
money and carry them on in the same way through successive agencies
for the plaintiff to their final destination. If these agents should con-
sent to act for the plaintiffs, and be able to negotiate bargains with the
other carriers for transportation through, the goods would go to New
York as was intended; but they would go under three separate contracts
made at different times through this imaginary agency with three
different and independent parties.

The first objection to the defendants' theory of this transaction is that it is contrary to the fact. The owner of goods in a case like this does not in fact appoint or employ the successive carriers in the continuous line as his agents to hold his money for him, and as his agents carry it forward and contract in his behalf with the other roads for further transportation. He makes but one contract for one price ; he pays the price, and the money he has paid does not belong to him, but to the associated carriers in proportions fixed by their agreement. He does not inquire, nor is he interested to know, how they divide the money. The contract is entire and complete when he pays the price for transportation through, and everything to be done afterwards is regulated by the standing agreement among the associated carriers. He has no control over them as his agents ; he does not and cannot intermeddle with the manner in which they do the business or dispose of the money that he has paid for the carriage of his goods.

Let us see what are some of the consequences that would follow, if both parties in a case like this should act on the defendants' view of their legal rights. Suppose in this case the goods had been carried through to New York, and the defendants had not paid to the next carriers the proportion of the freight money which belonged to the other carriers ; and then suppose that the Norwich & Worcester Railroad should sue the plaintiffs for carrying the goods over their road. It would avail the plaintiffs nothing to say that they had paid the freight through when the goods were received at this end of the route. The ready answer would be : " To be sure, you put money into the hands of your agents, the Worcester & Nashua Railroad, to pay us, but they neglected their duty ; your money is still in their hands, and we are not paid." It is, however, quite clear, that the money received by the defendants for transportation through on the connected line would be held by them for all the parties to the line ; they would be bound to account for it under their agreement as one partner accounts with his fellows for money received on partnership account. Then if the plaintiffs should undertake to pay the different carriers, how are they to know the share of each ? The proportions of the freight money belonging to them respectively are regulated by a private agreement of which the plaintiffs know nothing, and of which in the way the business is actually conducted they have no need to be informed. If the plaintiffs had proposed when they delivered the goods to pay the Worcester & Nashua road their proportion of the freight money and afterward to pay the other carriers their respective shares, they probably would have found nobody to tell them what the different shares were, or to receive the goods to be carried on such terms. In truth the connected line transacts business as one joint concern, and the business cannot be transacted otherwise with convenience either to the carriers or the owners of the goods.

Then if we look to the remedy of the associated carriers for the recovery of the freight money, each, on the theory of the defendants, must bring a separate suit on the separate contract for his proportion of the money. We have had occasion to learn from the facts stated in another

case now pending before us that there is a connected line consisting of six or seven different railways extending from Ogdensburg in New York through Vermont and New Hampshire to Boston in Massachusetts, in which one price is paid for transportation through and the money divided by a standing agreement as in this case.  If goods are carried through on this route, and there are six or·seven different contracts, one with each road, then each road must bring a separate action for its share of the freight money.  If it should be said that the remedy of the roads is to retain the goods at the end of the route till the whole price for transportation through is paid, this, in the first place, would show that these roads are so combined that for their own purposes they are a unit, while they insist that they are wholly separate and independent when the owner seeks redress for the loss of his goods. And then again, if the roads act separately and are not jointly interested in the business of the connected line, when one of the roads parts with the possession of goods by delivery to another, it loses its lien for the freight money, and cannot transfer it to another independent carrier. Angell on Carriers, 357, 359, 609.  This is not at all like the maritime lien, when a voyage is broken up and the cargo is put on board another vessel to be carried to the port of destination.  There the lien on the cargo for the whole freight is transferred to the second vessel, which completes the transportation under one contract.

The use of steam in carrying goods and passengers has produced a great revolution in the whole business.  The amount and importance of it have of late vastly increased and are every day increasing.  The large business between different parts of the country is done, as in this case, by parties who are associated in long continuous lines, receiving one fare through and dividing it among themselves by mutual agreement.  They act together for all practical purposes so far as their own interests are concerned as one united and joint association.  In managing and controlling the business on their lines they have all the advantages that could be derived from a legal partnership.  They make such an arrangement among themselves as they see fit for sharing the losses, as they do the profits that happen in any part of their route.  If by their agreement each party to the connected line is to make good the losses that happen in his part of the route, the associated carriers, and not the owner of the goods, have the means of ascertaining where the losses have happened.  And if this cannot be known, there is nothing unreasonable or inconvenient in their sharing the loss, as in case of a legal partnership, in proportion to their respective interests in the whole route.

They undertake the business of common carriers, and must be understood to assume the legal liabilities of that business.  They transact the business under a change of circumstances ; but the principles and the general policy of the common law, which, as an elementary maxim, holds the common carrier liable for all accidental losses, must be applied to these new methods of transacting the same business ; and there is certainly nothing in the present condition of the business, which calls for any relaxation of the old rule.  The great value of commodities trans-

ported over these connected lines; the increased risk of loss and damage from the immense distances over which they carry goods; the fact that where goods are once entrusted to carriers on these long routes they are placed beyond all control and supervision of the owner are cogent reasons for holding those who associate in these connected lines, to a rule that shall give effectual and convenient remedy to the owner, whose goods have been lost or damaged in any part of the line. Any rule, which should have the effect to defeat or embarrass the owner's remedy, would be in direct conflict with the principles and whole policy of the common law.

What then is the situation of the owner, whose goods have been damaged or lost on a continuous line of three or any larger number of associated carriers, if he can look only to the carrier, on whose part of the route the damage may have happened? In the first place he must set about learning where his loss happened. This would often be difficult and sometimes quite impossible. Suppose an invoice of flour shipped in good order at Ogdensburg were found on arrival at Boston to have been damaged somewhere on the route; or suppose a trunk checked at Boston for Chicago was broken open and plundered before it reached Chicago, what would the owner's chance be worth of finding out in what particular part of the route the damage happened? He would have no means of learning himself; and he would not, unless of a very confiding disposition, rely on any very zealous aid in his search from the different carriers associated in the connected line. And if he should have the luck to make the discovery, he might be obliged to assert his claim for compensation against a distant party, among strangers, in circumstances such as would discourage a prudent man, and induce him to sit down patiently under his loss rather than incur the expense and risk of pursuing his legal remedy under the rule set up by these defendants. The forlorn condition of the owner in such a case is put in a strong light by Waite, C. J., in his dissenting opinion, *Elmore* v. *The Naugatuck Railroad*, 23 Conn. 478, where he says : " A merchant residing in Cleveland, Toledo, or Chicago, purchases goods in the city of New York, which he wishes to send to his place of business. He enters into a contract with a railroad company for their transportation, not to any given point on the route, but for the whole distance. He delivers the goods to the company and they are taken and locked up in freight cars. He does not accompany them, and often sees and hears nothing more of them until they are delivered to him at their place of destination. The cars in which they are placed are often run over roads belonging to different companies to save trouble and expense of change of cars. If the goods are lost or damaged on the route he ordinarily has no means of determining where or in whose custody the injury occurred. The trouble and expense of ascertaining that fact in many cases would amount to more than the whole damage. As a prudent, cautious man he would be unwilling to entrust his goods to the custody of others, unless he could find some person or company that would be responsible for their safe delivery." The remarks of Smith, J, 34 New York 501, before cited are of the same import, showing the

difficulties and embarrassments of the owner, if he can only resort for compensation to the carrier in the connected line, on whose part of the route the damage happened.

A rule, which throws such difficulties in the way of the owner who seeks to recover of common carriers for the loss of his goods, I cannot but regard as a wide departure from the general doctrine of the common law on this subject; and nothing is plainer than the duty of courts to apply the general principles of the common law to the new circumstances which are introduced by changes in the manner of transacting any business.

Few things are of greater importance to the whole country than the cheap, convenient, and safe transportation of goods between distant points. Vast sums of money are expended to promote this object. The business is already immense and constantly increasing. Most of this business is done on connecting lines of railroads and steamboats, and these by continuous lines have a practical monopoly of the business on their respective roads. The owner of goods must entrust them to these associated carriers; they cannot be carried in any other way. Not only those who are engaged directly in carrying and sending goods are interested in this subject; all who produce and all who consume are interested that goods should be carried as cheaply, as conveniently, and as safely as possible. Public policy and the public interest concur with the general maxim of the law that those who transact this great business, should be held to a rule which shall give a ready and effectual remedy to the owner whose goods have been lost or damaged in any part of these connected lines of transportation.

There is a perplexing diversity of decision on this subject, in the different tribunals of this country. For instance, by the law of New York, as we understand it to be established by the construction which the courts have given to their statute, if goods are received in that State for transportation through on a connected line of railroads, the road that receives the goods is liable for loss or damage happening in any part of the connected line, though beyond the limits of the State. *Burtis* v. *The Buffalo & State Line Railroad, qua supra.* As has been before mentioned, there is a connected line of six or seven railroads extending from Ogdensburg to Boston. If goods are received by the Ogdensburg Railroad for transportation to Boston, and are lost or damaged on any part of the line, say on the Lowell Railroad, the Ogdensburg Railroad is liable for the loss. But if merchandise is received at Boston by the Lowell Railroad for transportation to Ogdensburg over the same connected line of railroads associated under the same agreement, the owner would be left to find out, if he could, on which of the six or seven connected roads his goods were lost or damaged, and could claim for his loss of that road alone. There would seem to be no remedy for this confusion and conflict of decisions unless the national legislature can provide one under the power given by the constitution to regulate commerce.

I come to the conclusion that on the case stated the plaintiffs are entitled to recover; and such is the unanimous opinion of the court.